Irene BROOKS, Plaintiff,

v.

ASHTABULA COUNTY WELFARE DEPARTMENT, Ashtabula County Commissioners, Defendants.

Civ. A. No. C78–62Y.

United States District Court, N. D. Ohio, E. D.

May 7, 1981.

bula County Welfare Department, the Ashtabula County Commissioners, and the Department of State Personnel,[1] alleging sex discrimination in employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983.

Ms. Brooks specifically alleges that the Welfare Department has operated and continues to operate under a policy, practice, custom, or usage of discrimination against her, and against other female employees, on the basis of sex in (1) the terms, conditions and privileges of employment; (2) the assignment of job classifications; and (3) areas of promotion. Brooks further alleges that the County Commissioners have acquiesced in these discriminatory practices to her detriment, and to the detriment of other female employees. She seeks declaratory and injunctive relief, compensatory and punitive damages, and attorney's fees. This Court has jurisdiction.

Upon consideration of the evidence adduced at a two-day trial, stipulations, and briefs of the parties, the Court finds that the defendant Department's policies and practices with regard to the terms, conditions and privileges of employment; job assignments and classifications; and advancement and promotional opportunities are discriminatory on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and also 42 U.S.C. § 1983. Further, the Court finds that the Ashtabula County Commissioners have acquiesced in these discriminatory practices.

Kathryn J. King, Alan I. Goodman, Cleveland, Ohio, for plaintiff.

Mark S. Gervelis, Asst. Prosecutor, Jefferson, Ohio, Malcolm C. Douglas, Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

This action was brought by the plaintiff Irene Brooks against the defendants Ashta-

### FINDINGS OF FACT

#### I

The Ashtabula County Welfare Department (Department) is under the control of the Ashtabula County Commissioners (Commissioners), pursuant to the provisions of Ohio Revised Code §§ 329.01–329.05. The Department is the body authorized to provide social services to the residents of Ash-

---

1. By agreement of the parties, the Department of State Personnel has been dismissed.

tabula County including general relief, aid for the aged, aid to dependent children, aid for the disabled, the food stamp program, medicaid, and other specialized programs. The Department is administered by John H. Koren, who has the ultimate responsibility for hiring and promotional decisions. When Koren became the Director in 1959, there were 10 employees in the Department; by 1970, there were 43; and the Department had 74 employees at the time of trial.

Plaintiff Irene Brooks was first employed by the Department on May 1, 1963, and was certified as a Caseworker I on January 15, 1964, at a salary of $330 per month. She had completed over three years toward her college degree, and had three years' experience as a school teacher. Brooks was classified as a Caseworker II in 1964, and in 1967 she was a Caseworker III. Neither of these classifications was at the supervisory level.

When the State of Ohio modified certain of its social services procedures in 1969, case work in the Department was divided between an Intake Section and an Ongoing Section.. Brooks was assigned to the Intake Section. Her new duties included processing applications for the various services provided by the Department, and determining eligibility on a periodic basis. Brooks' responsibilities have remained fairly constant since 1969, although her position has since been reclassified by the State of Ohio.

Brooks made requests for a supervisory promotion during the late 1960s; however, Koren advised her to complete the requirements for her college degree. This was despite the fact that Caseworker IV was the supervisory classification for those caseworkers without college degrees. In 1970, Thomas Schullery became Brooks' supervisor and requested her to train and supervise new employees, including caseworkers and some Social Workers who had college degrees. These additional responsibilities were assumed by Brooks at the same time that she carried on her usual duties, and without additional compensation. Brooks made additional requests for promotions through Schullery, who had begun evaluating Brooks' performance and had found her to be a very good employee. Between 1970 and 1973 Schullery, on several occasions, recommended Brooks for promotion to Caseworker IV, but Koren informed him that there were several other people Koren wanted to promote first. Once it became obvious to Schullery that Brooks would not be promoted, he relieved her of her training and supervisory responsibilities.

Additional evidence of the promotion policies and practices of the Department was presented by Brooks.[2] The witness Judy Beahon (Van Allen), a female with an undergraduate degree in Social Work, was hired by the Department in June, 1969 as a Social Worker I, Step 1, Range 16. In January, 1970, Thomas Schullery, a male with an undergraduate degree in Bible Studies, was hired in the same classification. Schullery became the Supervisor of the Intake Section in May 1970; and he and Beahon were classified and paid equally in January 1971. However, by July 1971, Beahon was a Social Worker II, Step 2, Range 18; and Schullery was a Social Worker III,[3] Step 2, Range 21, with a higher salary. By December 1972, Beahon was at her same classification while Schullery moved up to Social Worker IV, Step 2, where he remained until his resignation in 1975. Openings for the positions of Social Worker III and IV, to which Schullery was promoted, were never posted or otherwise announced to the staff.

Paul Fuller was another male who began with the Department after Beahon was

---

2. The Court notes that this action is brought by Brooks as an individual, rather than as a class representative; however, the Court deems the overall evidence presented by Brooks with regard to policies and practices toward female employees, as a group, highly probative of the question whether Brooks, as an individual, was the victim of sex discrimination as a result of these policies and practices.

3. Schullery's uncontroverted deposition testimony was that he had requested a promotion to Social Worker II, but that Koren insisted that he would be promoted to Social Worker III.

hired, with the same rank, unit, and duties as Beahon. Between 1970 and 1974, Fuller advanced from Social Worker I to Social Worker IV; [4] and in 1973, he was promoted to Supervisor of the new Social Services Unit. There was no posting for this new unit, nor were there postings or competitive examinations for Fuller's position. His promotion was announced, after it was known, at a staff meeting as a result of questioning by other employees.

Beahon's uncontraverted testimony was that she possessed the minimum qualifications for a supervisory position, that she requested promotions, by letter, in 1973, but that Koren never responded.

During the years 1970 through 1975, there were no female employees, in a non-clerical category, with the title, compensation, and duties of supervisor. Koren contends that throughout his tenure female employees have held supervisory positions, commencing with a Mrs. Osborn, who acted as a "working supervisor" [5] in the late 1960s. He also named Mrs. Kaufman and Mrs. Zalemini. Other witnesses, however, testified that these women never supervised anyone. Kaufman had the title Intake Supervisor, but this is the position Schullery took over in May 1970, and he testified that he supervised Kaufman, although she was classified as a Caseworker IV. Zalemini was in the Medicaid Unit, and there was testimony that she was the only one in the unit for a period of time prior to 1973.

The parties stipulated that during the 1970 through 1975 period, the Department did not post job vacancies, including those at a supervisory level. Moreover, there was no table of organization to show the supervisory chain of command; the number of potential positions at various levels; those positions designated as supervisory, and the numbers of positions and/or departments supervised by those persons in supervisory positions. There also was no policy or procedure for competitive bidding or examinations for promotional vacancies. It was Koren's testimony that the Department has never posted announcements for promotions into supervisory positions because he viewed those decisions as management's prerogative. Although he was aware that the Ohio Administrative Rules required merit selection of employees, Koren viewed those requirements as "recommendations" only.

Supervisors were never required to make written evaluations of the employees on a regular basis. Those evaluations that were written usually were not placed in the employees' files, and were not relied on by Koren when he made promotional decisions. Instead, Koren relied on his personal evaluation of the individuals, using standards established by him. He articulated those standards for supervisory qualifications as including: (1) minimum qualifications as contained in the job specifications provided by the State of Ohio; (2) a positive outlook toward one's fellow man; (3) the ability to absorb rules and regulations; (4) the ability to take and give instructions; (5) the ability to get along with one's fellow man; and (6) an understanding of human need. Koren explained that these standards were not contained in any written documents, but were maintained in his head, and were uniformly and consistently applied by him whenever he made the decision to promote a given employee into a supervisory position.

With regard to Brooks, Koren denied that Schullery had ever recommended her for promotion. However, he did acknowledge that Brooks wrote him letters asking why she was never promoted. He explained

---

4. When Koren requested Fuller's promotion from Social Worker II to Social Worker III, in his November 8, 1972 letter to the Department of State Personnel, he indicated that Fuller did not have enough time in the Social Worker II grade; however, because Fuller was "filling the shoes" of a former employee, Koren felt that time in grade was "of little importance." See Plaintiff's Exhibit 5b.

5. "Working supervisor" was defined by Koren as one who did not get a grade increase. The witness Beahon testified that Mrs. Osborn was under the supervision of Leonard McDaniels; she supervised employees under McDaniels in a similar fashion to Brooks' supervision of employees under Schullery.

that, in his judgment, Brooks was abrasive and judgmental in her attitude; and that she had engendered complaints from other agencies, lawyers, doctors, co-workers, and clients. He also felt that she had a propensity for making arbitrary moral judgments with respect to welfare clients. On cross examination, however, Koren admitted that there was no record of any complaint from any source in Brooks' personnel file. There was also no evidence that Koren ever discussed any complaints or problems with Brooks. Further, Koren did receive favorable evaluations from Schullery, which were contained in Brooks' file.

Koren also stated that Judy Beahon was never promoted because he did not consider her to be "as good", either.

In addition to those females previously named, Koren testified that other female supervisors were June Johnson, who began supervising the clerical staff, with 12 full-time and 6 part-time employees, in 1973; Eleanor Peckol and Janet Tomko, who became supervisors in 1976; and several other females who were promoted thereafter.

Janet Tomko, who was Brooks' supervisor from February 1976 to March 1979, testified that she reported to Koren that Brooks' performance was uneven, though acceptable, ranging from minimum to very good; her temperament was uneven, and that she sometimes exhibited an intolerant attitude toward clients. Tomko did not recommend Brooks for promotion; neither did she make written evaluations of Brooks' performance. In fact, any evaluations of employees supervised by Tomko were made in periodic oral discussions with Koren.

Tomko testified she was unaware of any discriminatory policy in the Department. However, she did admit that she had made applications for promotions, whenever positions became vacant, from the inception of her employment, in 1970, as a Social Worker II.[6] She was not promoted, however, and she remained in that classification until

January 1976, when she was reclassified as an Income Maintenance Worker III. In 1975, she was given "quasi-supervisory" duties—i.e., two clerical staff members were added to her responsibilities—and it was not until February 1976, that she was promoted to Intake Supervisor[7] with the classification Income Maintenance Worker IV.

## II

According to the job specifications promulgated by the Department of State Personnel, the nonclerical positions which did not require a college degree were Caseworker III and IV; Investigators I, II, and III; and Administrative Specialists I, II, and III. In December 1967, Robert McCoy became the first investigator hired by the Department, and was classified as an Investigator II, Step 2, with a salary of $499 per month. By November 1968, he was an Investigator III, at $572 per month. Prior to the creation of the Investigator's position in the Child Support Unit, the duties of the investigators were performed by the caseworkers. All of the investigators' positions were filled by males. June Johnson, who supervised the clerical staff and acted as personnel officer, was the only female classified as an Administrative Specialist.

The males who filled these positions during the years 1967 through 1973 did not have college degrees, and had not worked for the Department prior to obtaining these positions. The parties stipulated that through her work and educational experience, Brooks possessed the minimum qualifications for all of these positions. However, there were no announcements or posting of vacancies for the positions prior to the time they were filled. Therefore, Brooks, and other females within the Department, were never given any opportunity to compete, or even to apply, for the positions.

---

6. Tomko left the Department in March 1972 and returned in October 1973. Upon her return, she remained a Social Worker II.

7. The Intake Supervisor's position was filled by Thomas Schullery from 1970 through 1975. He was replaced by Robert Frederick. After Frederick left, Tomko became the supervisor.

## III

In 1971, three employees of the Department[8] complained to the Commissioners about personnel practices within the Department. At the request of the Chairman of the Commission, the Ashtabula County Welfare Advisory Board conducted a study of the Department and made a written report to the Commissioners in June 1971. Included in the report were recommendations for greater communication between the Commissioners and the Director of the Department, and for the institution of written policies, written evaluations every six months, and merit promotions within the Department.

Koren indicated that he was not aware of the employees' written complaint until preparation for trial, but he was aware of the Advisory Board's recommendations as soon as they were sent out. He testified that after the policies came down from the Board, he complied as much as he could.

There was no evidence presented to show that the Commissioners did anything further to remedy the situation in the Department, although they were made aware of the problems as early as 1971.

## IV

The impetus for plaintiff bringing this action appears to be the hiring of Ralph Butler in 1973. Although not alleged in her Complaint, Brooks specifically alleged in her charge before the E.E.O.C., and at trial, the disparity between her position and treatment as an employee, in the terms and conditions of her employment, and that of Butler, a nondegreed male with two years college experience. Butler began working for the Department on April 19, 1973, in a position similar to Brooks', but at a higher classification and higher salary. At the time Butler was hired, Brooks had been with the Department for 10 years, and was classified as a Caseworker III, Step 5, with a bi-weekly salary of $314. Butler was hired as an Administrative Specialist II,

Range 18, Step 3, with a bi-weekly salary of $339.20.

Butler was hired into a newly created position in the Medicaid Unit. His duties included taking applications and making evaluations for eligibility in the Medicare program. Koren explained that Butler was hired into this position because of Koren's need for personnel to work in the intake process in the Medicaid Unit; with nursing home management, families, and funeral directors; and his need for someone with the ability to work with people. Although Brooks had all of these qualifications, Koren admitted that she was never considered for the position.

Butler's experience was that of a dairy farmer, a tester of milk for butter fat, and 8 years as an interviewer with the Ohio Bureau of Employment Services (OBES). Koren testified that Butler had been "laid-off" from his position with OBES as a result of a state-wide patronage ouster of holdover employees. He further explained that Butler's job classification and salary resulted from Koren's understanding that Butler was making a lateral transfer as a State employee, and that his compensation should not be diminished. Butler's last annual salary at OBES was $8,486; his beginning salary with the Department was $8,819.

The positions held by Brooks and Butler required the same qualifications and had essentially the same duties and responsibilities. This is underscored by the fact that when the State of Ohio reclassified all employees on January 4, 1976, both positions were reclassified as Income Maintenance II, Range 27. However, Brooks was at Step 2, with a base hourly rate of $4.80; while Butler was at Step 5, with a base hourly rate of $5.55.

The evidence showed that step increases are automatically given each year, and are based on longevity rather than on merit. However, in July 1976 and July 1977,

---

8. Thomas Schullery, Leonard McDaniels (both supervisors), and Phyllis Vanek, Koren's secretary.

Brooks received increases to Steps 3 and 4, respectively, while Butler did not receive any step increase.[9] As of July 2, 1978, Brooks was also at Step 5 and she and Butler received the same salary. In 1979, they were both reclassified as Income Maintenance Worker III, with Brooks at Step 4 and an increase in pay; Butler was at Step 3 with no increase. By July 1, 1979, and until the time of trial, Brooks' salary was greater than that of Butler.

V

Defendants also introduced evidence to show the policies and practices that have existed in the Department since 1976. There is presently a table of organization which is not posted, but is kept in Mrs. Johnson's office, and is made available to interested employees. The same is true of job specifications. The procedure for job openings now is to verify with Administrative Services whether there is a certification list. If there is not, positions are posted within the Department. When the posting period is over, the supervisors review the applications and determine, through his/her own methods, whether the applicant is qualified for the position, or whether the supervisor wants the applicant on his/her team. There are no written, or otherwise articulated, guidelines to aid supervisors in making this determination. Written evaluation forms are not mandatory, and are used by supervisors on an irregular basis.

Additionally, the majority of supervisors in the Department are now female.

CONCLUSIONS OF LAW

I

■ Defendants contend that most of plaintiff's complaints are centered around events which occurred prior to March 24, 1972, the effective date of the extension of Title VII to the States and their subdivisions, and are thus irrelevant. It is true that a public employer who may have pur-

posely maintained policies and practices of discrimination prior to March 24, 1972, would not violate Title VII if all of its employment decisions are made in a wholly nondiscriminatory way after that date. *Hazelwood School District v. United States,* 433 U.S. 299, 309, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977). The Supreme Court did note, however, that there are some circumstances under which pre-Act discrimination may have some probative value:

> ... Proof that an employer engaged in racial discrimination prior to the effective date of Title VII might in some circumstances support the inference that such discrimination continued, particularly where relevant aspects of the decision-making process had undergone little change....

*Id.,* at 309, 97 S.Ct. at 2742, n. 15.

Most of the "relevant aspects of the decision-making process" in this case underwent no change until 1976—four years after the effective date of the Act. Some of those aspects, such as the selection process for promotional vacancies and supervisory personnel had not changed by the time of trial in 1980. Therefore, this Court considers the historical and background evidence presented by plaintiff Brooks to be relevant to the issue of defendant's policy, practice and custom of discrimination.

Plaintiff also alleges a violation of 42 U.S.C. § 1983. It is clear that pre-1972 evidence is relevant and probative of that issue.

II

Plaintiff proceeded to trial on her claim for recovery under Title VII on a disparate treatment theory. In distinguishing disparate treatment from its related theory, disparate impact, the Supreme Court noted, in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977):

---

**9.** This was after Brooks filed her charge with the E.E.O.C., but prior to the filing of the Complaint in this case. It appears that Butler was the only male who did not receive a step increase for those years.

'Disparate treatment' . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. . . . Undoubtedly, disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII. . . .

Claims of . . . 'disparate impact' . . . involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. . . . Prcof of discriminatory motive, . . . is not required under a disparate-impact theory. . . .

*Id.*, at 335, 97 S.Ct. at 1854, n. 15. It is clear that under the disparate treatment theory, proof of discriminatory motive is critical to plaintiff's case. This critical finding can be established, however, if the plaintiff can sustain her initial burden of a prima facie showing as set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Teamsters, supra* 431 U.S. at 358, 97 S.Ct. at 1866.

█ The basic allocation of the burden of proof in a disparate treatment case under *McDonnell-Douglas*, and as reaffirmed in the Supreme Court's recent decision in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), is that:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' . . . Third, should the defendant carry this burden,

the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.*, at 252, 101 S.Ct. at 1093. The "appropriate model" [10] for a prima facie case of discrimination under *McDonnell-Douglas* is that the plaintiff must show (1) that she belonged to a protected class; (2) that she applied for and was qualified for a position for which the employer was seeking applicants; (3) that despite her qualification, she was rejected; and (4) that, after her rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualification. *Id.* at 802, 93 S.Ct. at 1824.

By making this prima facie showing the plaintiff has supplied the Court with sufficient proof to "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that . . . [the employer's] actions were bottomed on impermissible considerations." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 580, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978).

█ Plaintiff Brooks' evidence sustained her burden of establishing a prima facie case of sex discrimination with regard to the terms and conditions of employment; assignment of job classifications and promotional opportunities within the Department; and the specific allegations about the hiring of Ralph Butler, including the equal pay aspect of those allegations. She is a member of a protected class. Defendants stipulated that she was qualified for the positions of Investigator I, II and III, and Administrative Specialist I, II, and III; however, she was never considered for these positions. She could not apply for them because there was never any information provided to apprise her of their availability.

---

**10.** Because *McDonnell-Douglas* involved racial discrimination in hiring, the Court noted that the enumerated specifications for a prima facie showing would not be applicable in every respect to the varying fact situations that necessarily arise under Title VII. *Id.*, at 802, 93 S.Ct. at 1824, n.3.

All of these positions were filled by males. Brooks did apply for and was qualified for promotion to the position of Caseworker IV. There was no evidence that the promotion position sought by Brooks was filled by a male; however, there was evidence of the disparate treatment of other qualified females, including defendants' own witness, Janet Tomko, who sought supervisory promotions but were rejected, and the positions were subsequently filled by males.

During the period 1970 through 1975, male employees were substantially outnumbered by female employees; however, there were substantially more male supervisors than female. Additionally, the males were given preferential treatment by being placed in better positions, in higher classifications and pay ranges, and by progressing more rapidly in the Department than were the female employees. Males who began in the same positions as females quickly rose above them and continued to progress while their female counterparts remained in the same jobs, or progressed at a much slower rate.[11] Thus, in this pattern or practice action Brooks sustained her initial burden of demonstrating that "unlawful discrimination has been a regular procedure or policy followed" by the Department. See *Teamsters, supra* 97 S.Ct. at 1867.

Once plaintiff establishes a prima facie case of sex discrimination the burden of production shifts to defendants. It is sufficient if defendants' evidence (of a legitimate, nondiscriminatory reason for its actions) raises a genuine issue of fact as to whether it discriminated against the plaintiff. See *Burdine, supra* at 255, 101 S.Ct. at 1094. There the Court further explained that:

> [t]o accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If

the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.

Defendants offered no evidence to rebut the legally mandatory presumption of sex discrimination with regard to the terms, conditions, and privileges of employment, or assignment of job classifications, for the years 1970 through 1975. Because no issue of fact remains as to those issues, the Court must enter judgment for the plaintiff. See *Burdine, supra* at 254–255, 101 S.Ct. at 1094–1095.

Koren's justification for refusing to promote Brooks was that she manifested certain characteristics that he felt were inappropriate for a supervisory position, and also because of the complaints he had received from outside and within the Department regarding Brooks. The question of Brooks' ability to get along with people, especially co-workers and clients, bears heavily on the determination whether she was not promoted because she is a female. Defendants cite *Shack v. Southworth*, 521 F.2d 61 (6th Cir. 1975) as upholding a refusal to hire a minority applicant because of his attitude. Defendants misstate that case. *Shack v. Southworth* involved a situation where the plaintiff, a black, was one of five applicants (out of more than 70 screened) chosen for a final examination and interview for two openings for deputy sheriff. The plaintiff scored highest of the five on the written examination, but was rated third by the board conducting the oral interview. It was determined that although qualified, the plaintiff, even by his own admission, had no real interest in working for the sheriff's department. Consequently, plaintiff in that case did not get one of the two jobs, but was notified that he would be, and actually was, hired when the next vacancy occurred. In addition, the

---

11. Because of the limitations of the statistical information prepared by one of plaintiff's trial counsel, the Court has given no weight to Plaintiff's Trial Exhibits I and II, which were offered to reflect this disparity. Instead, the Court has considered the payroll records of the Department and the defendants' answers to plaintiff's Requests for Admissions, all of which were entered as exhibits.

plaintiff could identify no qualified black applicants who had been denied employment; and there was evidence by an NAACP representative that defendant was willing to hire qualified black applicants but none had been referred by a county committee created to promote hiring of minorities.

Also cited by defendants is *Van de Vate v. Boling,* 379 F.Supp. 925 (E.D.Tenn.1974), where the Court upheld defendant's decision not to rehire the plaintiff because of her "personality", and because she "would not fit in with the staff". In that case there were a number of witnesses for both sides who testified to plaintiff's ability or inability to get along with people. The evidence showed that the defendant made efforts to hire personnel on the basis of their qualifications as well as their ability to fit in with the staff. Further, these hiring decisions were made in light of applicable university regulations, and there was nothing in the record to indicate that sex had anything to do with the refusal to hire the plaintiff.

We do not have either of these situations in this case. Unlike the plaintiff in *Shack v. Southworth,* Brooks was very interested in being promoted to a supervisory or better paying position but was never even considered, although she demonstrated her ability to function in a supervisory capacity. Further, there was no evidence at all of any willingness on the part of defendants to promote qualified females to supervisory positions. Indeed, the evidence showed a definite unwillingness by Koren to promote females or place them in the better paying positions prior to 1976. The only evidence presented with regard to Brooks' ability or inability to get along with people was Koren's own testimony. This testimony was sufficiently discredited by Schullery's favorable evaluations and recommendations for Brooks' promotions during the 1970–1975 period, as well as Koren's own admission that he had no evidence to support his claim that he received complaints about Brooks. Tomko's testimony is not relevant to this time period since she did not become Brooks' supervisor until 1976.

*Olson v. Philco-Ford,* 531 F.2d 474 (10th Cir. 1976), another case cited by defendants, considered the question whether the promotion of a qualified male rather than a qualified female, competing for a single opening, was sufficient to establish a prima facie case of sex discrimination. The Court held that, standing alone, such showing was insufficient. In *Olson,* as here, the defendant did not post notices of vacancies and did not conduct formal interviews. However, unlike the situation here, there was no showing that in carrying on these practices the defendant engaged in sex discrimination. Indeed, the plaintiff in *Olson* knew of the vacancy and was interviewed by the Associate Director of the company, who made recommendations to the Director. Additional evidence showed that the Director considered all available information including recommendations received. The defendants' stated reasons for promoting the male in *Olson* were his apparent ability in leadership and public relations, and his demonstrated relationship with other staff members. While those reasons were not totally objective, there was no other evidence before the Court, including statistical evidence, to show the defendants' promotion policies.

In this case, the overall evidence shows that during the 1970–1975 period, the Department maintained a policy and practice of promoting males to supervisory positions within a short period of their initial employment with the Department. Female employees, on the other hand, were either put off for various reasons, made "working supervisors", or completely ignored when they made requests for promotions.

This disparity in treatment directly results from the fact that promotional decisions were within the sole discretion of the Director, John Koren. During the relevant time period the Department used no regular, written evaluations of its employees, or any other objective means by which to determine the employees best qualified for periodic promotions, and promotions to supervisory positions; moreover, there was a

failure to observe the state employees' merit system. In most instances supervisory (and other vacancies) were filled from within, or by hiring new personnel, before existing employees were even aware that a vacancy existed.

The Sixth Circuit Court of Appeals has stated, in *Abrams v. Johnson*, 534 F.2d 1226 (6th Cir. 1976), that absolute discretion over employment decisions where subjective race prejudice may control is no longer consistent with our law. See also *Senter v. General Motors*, 532 F.2d 511 (6th Cir. 1976), and *Rowe v. General Motors*, 457 F.2d 348 (5th Cir. 1972). This Court is of the opinion that the same principle holds true in sex discrimination cases.

In *Rowe*, hourly employees were seeking transfers or promotions to salaried positions. The promotion process was two-fold—employer initiated or employee initiated—and in both, the foreman's recommendation was required. That recommendation was partly based on the foreman's subjective evaluation of an employee's "ability, merit, and capacity". Seniority was not a factor, although experience was an indirect consideration. Prior to trial (as here), job openings were not posted and employees were not aware of openings or of qualifications necessary to obtain such jobs. The Court recognized that procedures which depend almost entirely on the subjective evaluations and favorable recommendation of the immediate foreman are a "ready mechanism" for covert discrimination. Those factors, which are present in this case, are:

1. the foreman's recommendation [here, the Director's determination] is the indispensable, single most important factor in the promotion process;

2. the foreman is given no written instructions regarding the qualifications necessary for promotion [here, the Director uses no objective criteria to determine qualifications];

3. the standards determined to be controlling are vague and subjective;

4. employees are not notified of promotional opportunities nor the qualifications necessary for promotion;

5. there are no safeguards in the procedure designed to avert discriminatory practices.

Although *Rowe* was a disparate impact case, this Court is of the opinion that these factors are equally applicable in this disparate treatment case.

Defendants emphasize the fact that since 1976, the majority of supervisory promotions within the Department have been females, and that there are specific procedures used in making promotional decisions. While the Department's venture into the 20th Century is to be commended, "present good faith compliance is no defense as to past practices which have resulted in present damage." *Marquez v. Omaha District Sales Office, Ford Division*, 440 F.2d 1157 (8th Cir. 1971). The Department's recent changes in its promotion policies are of little comfort to Brooks, and others, who are victims of the earlier post-Act discrimination. These recent changes cannot erase the Department's previous illegal conduct, nor its obligation to afford relief to those who suffered because of it. See *Teamsters, supra*, 431 U.S. 342, 97 S.Ct. 1858.

Further, the procedures utilized by the Department at present are almost as faulty as those used prior to 1976, because heavy reliance is still placed on the subjective evaluations and determinations of the supervisors who review the applicants for promotions.

While the defendants need not actually persuade the Court that they were motivated by the reasons stated, they surely must produce enough evidence to raise a genuine issue of fact as to whether plaintiff was the victim of sex discrimination. *Burdine, supra* at 255, 101 S.Ct. at 1094. This defendants failed to do.[12] Accordingly, the Court finds that the plaintiff's evidence was suffi-

---

12. Although plaintiff offered no rebuttal evidence to show that Koren's explanation was a pretext for discrimination, the Court views the evidence as a whole, including Koren's cross examination testimony, as sufficient to sustain Brooks' overall burden of proof. See *Burdine, supra* at 255, n.10, 101 S.Ct. at 1095, n.10.

cient to prove by a preponderance of the evidence that defendants' explanation of their actions was in fact a pretext for discrimination, and that defendants' policies and practices were designed to, and did, discriminate against its female employees, and Irene Brooks, on the basis of sex in violation of Title VII.

## III

With regard to the specific allegation about the hiring of Ralph Butler, defendant articulated a legitimate, nondiscriminatory reason for its decision to hire Butler—*i.e.*, the need for additional personnel, and Koren's belief that Butler was a transfer from the State of Ohio payroll rather than a new hire. Support for this contention may be found in Koren's letter, dated April 16, 1973, in which he sought the Commissioners' permission to proceed with Butler's "transfer". (See Plaintiff's Exhibit 5d).

Plaintiff offered no rebuttal testimony on this issue but did request the Court to take judicial notice of *inter alia*, Ohio Revised Code § 124.32 regarding transfers. Upon consideration, the Court finds that this statute alone is insufficient to allow the Court to determine whether or not Butler was actually a transfer.[13] Nonetheless, even if Butler did in fact make a lateral transfer, Koren's explanation of Butler's salary is insufficient. While Koren might have operated under the belief that Butler's salary should not be diminished, surely he did not believe that state law required him to increase Butler's salary. At least that much is clear from the statute.

Accordingly, the Court finds that the limitation contained in the equal pay requirement of Title VII (42 U.S.C. § 2000e–2(h)) does not apply. Had Butler been "transferred" at his same rate of pay, which in itself was higher than that of Brooks, the situa-

tion might be different. Because his salary was increased, the Court finds, upon considering all of the evidence demonstrating that the better paying positions were held by male employees, that the pay differential was based on sex in violation of Title VII.

## IV

Brooks' final claim is based on 42 U.S.C. § 1983. Defendants cite *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), for the proposition that plaintiff must prove by a preponderance of the evidence, that defendants were motivated by a discriminatory purpose in their personnel decisions. In *Washington v. Davis*, the Supreme Court was reviewing a Title VII disparate impact case with allegations of equal protection violations, and violations of § 1981. The Court held that Title VII standards should not be applied in determining constitutional violations, and that proof of racially discriminatory intent is required to show a violation of the Equal Protection Clause.

Here, we are not dealing with facially neutral policies or rules which impact disproportionately on women. In disparate treatment cases, such as the one here, the employer simply treats some people less favorably than others for impermissible reasons. The inquiry then under § 1983 and Title VII becomes the same. Once the plaintiff establishes a prima facie Title VII case under *McDonnell-Douglas, supra*, which is not rebutted by defendants, then plaintiff has proved, by a preponderance of the evidence, that the defendants were motivated by a discriminatory animus in violation of Title VII and § 1983.

During 1970 through 1975, females made requests for and were qualified for promotions to supervisory positions, but

---

**13.** It is difficult for the Court to understand how Butler's termination from OBES could be deemed a "lay-off" (and his subsequent hire by the Department, a "transfer") since that term implies a possibility of being recalled to a former position. Given the political realities of patronage ousters, it is highly unlikely that a

recall would occur. Further, Koren's testimony that he hired Butler because of his concern that Butler had been "dropped" by OBES, is an indication that Koren also understood Butler's predicament as being one of termination rather than a lay-off. The Court, however, makes no finding as to this situation.

were not even considered by Koren. On the other hand, males were almost automatically promoted to supervisory positions, or were given higher classifications with higher salaries. When Thomas Schullery was promoted from Social Worker I to Social Worker III, without the requisite qualifications, Judy Beahon and Janet Tomko (both of whom were qualified) were seeking and were denied promotions in the Social Worker classifications. Those women identified by Koren as supervisors were either titular supervisors only, or were "acting" supervisors without the benefits of pay or grade increases.

The Court notes the yeoman's task performed by Koren and the difficulties and challenges he initially faced in organizing the Welfare Department and providing needed services to the residents of Ashtabula County without the benefit of definitive directions or guidelines from the State of Ohio. By the time the Department began to grow from its initial 10 employees, guidelines by which certain personnel decisions were to be made had been promulgated; however, they were largely ignored by Koren. Further, the few evaluations and recommendations made by supervisors were also ignored, and Koren created his own policies and procedures which insured males better positions, higher pay, and greater advancement opportunities, to the detriment of the female employees, and Irene Brooks. Therefore, the Court finds that Brooks has sustained her burden of proving that the Department, through Koren, purposely discriminated against female employees on the basis of their sex in violation of 42 U.S.C. § 1983.

### V

■ The final issue in this case is the relief to be afforded plaintiff Brooks, including the amounts and types of damages to be awarded. Pursuant to her Title VII claim, Brooks is seeking, in addition to a declaratory judgment, (a) permanent injunctive relief; (b) back pay; (c) attorney's fees and costs; and (d) an order of the Court retaining jurisdiction of this case until such time that defendants' unlawful activities have ceased. Under the § 1983 claim Brooks is seeking all of the above enumerated relief, plus compensatory and punitive damages.

The Court finds that Brooks is entitled to a permanent injunction against the defendants. The Court further finds that Brooks is entitled to a promotion to a supervisory position. While it is unclear what Brooks' supervisory classification would be at this point, it is clear that she should have been promoted to Caseworker IV at least as early as 1970. Therefore, Brooks is entitled to back pay in an amount which is the difference between what she earned and what she would have earned had there been no discriminatory denial of her promotion.

Title 42 U.S.C. § 2000e–5(g) provides that "[b]ack pay liability shall not accrue from a date more than two years prior to the filing of a charge" with the E.E.O.C. Brooks filed her charge with E.E.O.C. on July 3, 1973. The two-year limitations period would permit recovery from July 3, 1971; however, because Title VII was not made applicable to defendants until March 24, 1972, back pay liability under Title VII must be limited to that date. See *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364 (5th Cir. 1974).

Prior to the 1972 amendments the period of back pay liability has been interpreted as being controlled by the most applicable state statute of limitations. See *E.E.O.C. v. Detroit Edison Co.*, 515 F.2d 301 (6th Cir. 1975). The most analogous Ohio statute is Ohio Revised Code § 2305.10, with a two-year limitations period. Therefore, the Court finds that Brooks is entitled to compensatory damages in the form of back pay from July 3, 1971, on her § 1983 claim. Plaintiff Brooks presented no evidence of entitlement to any other compensatory damages. Nor was there any showing by plaintiff of any malice or willfulness which would warrant an award of punitive damages in this case.

Accordingly, it is hereby Ordered that the defendants are permanently enjoined and restrained from further operating under

any policy, practice, custom, or usage of discrimination against female employees on the basis of their sex in the terms, conditions, and privileges of employment; in the assignment of job classifications; and with regard to promotions.

It is further Ordered that the Department adopt policies which ensure that all employees are judged on a fair and impartial basis without regard to sex. These policies shall include (but shall not be limited to):

1. the announcement and posting of position vacancies and promotional vacancies, including those at the supervisory level;

2. the posting of job specifications for those positions in which vacancies exist;

3. the requirement that supervisors make periodic written evaluations of employees, which shall be kept in the employees' personnel files; and

4. the development of objective criteria or guidelines by which supervisors may determine whether applicants are qualified for position openings.

It is further Ordered that Plaintiff Irene Brooks be promoted to the appropriate supervisory position she would presently hold had she been promoted to Caseworker IV in 1970.

It is further Ordered that Brooks recover of defendants back pay, plus 8% interest, from July 3, 1971, to the date of judgment in this case. Brooks is also entitled to recover her attorney's fees and costs.

It is further Ordered that Plaintiff prepare and file with the Court documentation of the amount of back pay and attorney's fees and costs, by May 18, 1981. Defendants may file any objections within seven (7) days thereafter.

This Court is of the opinion that the injunctive relief granted is sufficient to ensure defendants' compliance with the law. Therefore, the Court will not retain jurisdiction in this case.

IT IS SO ORDERED.