Irene BROOKS, Plaintiff-Appellee,

v.

ASHTABULA COUNTY WELFARE DE-PARTMENT; Ashtabula County Commissioner; Department of State Personnel, Defendants-Appellants.

No. 81–3338.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 3, 1983.

Decided Sept. 1, 1983.

Rehearing and Rehearing En Banc Denied Nov. 11, 1983.

Malcolm C. Douglas (argued), Cleveland, Ohio, for defendants-appellants.

Alan I. Goodman (argued), Cleveland, Ohio, Kathryn J. King (argued), Simsbury, Conn., for plaintiff-appellee.

Before MARTIN and KRUPANSKY, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

Ashtabula County Welfare Department appeals from the district court's determination that it discriminated against Irene Brooks on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and 42 U.S.C. § 1983. The court found that the Welfare Department treated Ms. Brooks and other female employees differently from male employees in the terms, conditions, and privileges of their employment; in job assignments and classifications; and in promotional opportunities. Based upon its finding of disparate treatment in violation of Title VII, the court concluded that the plaintiff had also established a violation of section 1983. Ms. Brooks was granted monetary and injunctive relief.

The Ashtabula County Welfare Department, an arm of the Ashtabula County government, provides social services to county residents including aid to the aged, to dependent children and to the disabled, and special relief programs such as Medicaid and food stamps. John H. Koren became the Department director in 1959. He has ultimate responsibility for all personnel decisions within the Department. The Department has grown from ten employees in 1959, to forty-three in 1970, and to seventy-four in 1980.

Ms. Brooks joined the Department in 1963 as a Caseworker Level I (of four possible levels). She had completed three years of college and had three years' school teaching experience. By 1967, she had been promoted to Caseworker Level III. On several occasions in the late 1960's, Ms. Brooks had requested a promotion to a supervisory position. Unlike many other supervisory positions, Caseworker Level IV did not require a college degree. During the years 1970 to 1973, her supervisor, Thomas Schullery, also recommended her for promotion to a supervisory level and gave her supervisory duties within her assigned job. Director Koren repeatedly ignored or refused Ms. Brooks' requests for promotions because he believed she was temperamentally ill-suited to become a supervisor. In his judgment, her attitude was abrasive and judgmental, she had a propensity for making arbitrary moral judgments about welfare clients, and she aggravated co-workers, clients, lawyers, and doctors with whom her job brought her into contact. While Koren maintained that he had received numerous complaints about Ms. Brooks' attitude, her personnel file contained only one comment, a favorable evaluation from Thomas Schullery. At trial, however, Ms. Brooks' supervisor from 1976 to 1979 testified in support of Mr. Koren, describing Ms. Brooks as having had a poor attitude. Although Ms. Brooks possessed the minimum qualifications for promotion to positions not requiring a college degree, she was never given a position entailing supervisory responsibility.

Other evidence of promotional practices and policies within the Department consisted of promotional histories of other employees. Judy Beahon was hired in June, 1969 as a Social Worker Level I (of four possible levels). She possessed the requisite undergraduate degree for this position. Thomas Schullery, also possessing an undergraduate degree, was hired six months later to the same position. Two years later Beahon was a Social Worker Level II, while Schullery had achieved Social Worker Level IV, the highest level. Paul Fuller, hired in 1970 to the same rank and duties as Beahon, moved to Social Worker Level IV by 1974. Both

Schullery's and Fuller's promotions included supervisory responsibilities, but Beahon never received such responsibilities. The evidence as a whole showed that few if any women held supervisory positions before 1973. But after that date, and particularly after 1976, the number of female supervisors increased and finally exceeded the number of male supervisors.

The district court, 535 F.Supp. 366, also admitted evidence regarding compensation practices within the Department. Ralph Butler joined the Department in 1973 at a position similar to Ms. Brooks' but with a higher classification and salary. Butler, with two years of college experience and eight years of experience as an interviewer with the Ohio Bureau of Employment Services, was hired into a newly created administrative position in the Department's Medicaid Unit. Although Ms. Brooks was qualified for the position, Koren never considered placing her there. The district court found that Butler's starting wage was $5.55 per hour while Ms. Brooks earned $4.80 per hour for a job with the same duties and responsibilities. The court rejected Director Koren's proffered explanation for the disparity, that Butler was making a lateral transfer from another state job and that his compensation was to remain constant. By July 1978, Ms. Brooks' salary equaled Butler's. The following year, it exceeded his.

There was also testimony concerning other practices within the Department. It was undisputed that job vacancies were not posted and often remained unknown by the staff until filled. The Department had no procedures for either competitive bidding or examinations for vacancies. An organizational chart of the Department was never posted but could be viewed upon request to Director Koren's assistant. Supervisors were not required to prepare regular written evaluations. Those evaluations that were written either were not placed in personnel files or were not consulted by Koren when making promotion decisions. Koren articulated the factors he considered when making such decisions. They included: the minimum qualifications required by state

law; a positive outlook toward one's fellow man; the ability to "absorb" rules and regulations; the ability to give and follow instructions; the ability to get along with others; and an understanding of human need. In 1971, in response to complaints from departmental employees, the Ashtabula County Welfare Advisory Board recommended to Koren that he institute a program of written personnel policies, a required semiannual written evaluation, and promote within the Department according to merit. Koren testified that he had endeavored to implement these recommendations.

Suit was filed in March, 1978, alleging violations of Title VII and section 1983. The case proceeded under a disparate treatment theory, Brooks having alleged that the Department had treated her differently from male employees because of her sex. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). On May 7, 1981, after a two-day bench trial, the district court rendered a decision in plaintiff's favor. Relying upon the *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) standard, it found that the plaintiff had made out a *prima facie* case of disparate treatment. In making this determination, the court, upon the authority of *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), relied in part on evidence of pre-1972 policies of the Department. It concluded that the defendants had failed to rebut the *prima facie* case because, it found, Director Koren's legitimate reason for not promoting Ms. Brooks was unworthy of belief. Having found Title VII liability, the court then held the defendants liable for violating section 1983, ruling that a showing of disparate treatment under the former constituted a showing of intentional discrimination under the latter. The court ordered the defendants to implement specific promotional policies and to promote Ms. Brooks. The plaintiff also received monetary damages, including back

pay as a supervisor from July 3, 1971 to the present.

The defendants challenge the decision on several fronts. First, the defendants contend that the court erred in discrediting their articulated justification for not promoting the plaintiff and in failing to require the plaintiff to produce rebuttal evidence demonstrating that the justification was pretext. Second, the defendants maintain the court erred when comparing the jobs, skills and compensation of Ms. Brooks and Ralph Butler. The defendants also challenge the court's application of *Hazelwood* to consider pre-Act conduct in order to find the defendants liable and to assess damages. Finally, the defendants object to the courts' equating liability under Title VII with section 1983 liability in the absence of direct evidence of the defendants' intent to discriminate.

The parties do not dispute the fact that Ms. Brooks established a *prima facie* case of sex discrimination. The district court found the plaintiff had established a *prima facie* case with respect to the "terms and conditions of employment; assignment of job classifications and promotional opportunities within the Department; and the specific allegations about the hiring of Ralph Butler, including the equal pay aspect of those allegations." Dist.Ct. Memorandum Opinion, at p. 16. The first issue before us, then, concerns the defendants' articulated nondiscriminatory justification for their decisions and the plaintiff's rebuttal evidence.

In *Texas Department of Community Affairs v. Burdine,* the Supreme Court refined the allocation of burdens and order of proof in a Title VII suit, first enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." [*McDonnell Douglas,* 411 U.S.] at 802.

[93 S.Ct. at 1824] Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Id. at 804.

450 U.S. at 252–253, 101 S.Ct. at 1093. As we emphasized in *Norma Miller v. WFLI Radio, Inc.,* 687 F.2d 136 (6th Cir.1982), after the plaintiff has established a *prima facie* case, "the defendant assumes the burden of *producing* (as distinct from *proving*)" a legitimate nondiscriminatory reason for its actions. *Id.* at 138 (emphasis in original). Throughout the case the plaintiff retains "her continuing burden of *proof*" that the defendant discriminated against her. *Id.* (emphasis in original).

With the *Burdine* standard firmly in mind, we must at this point divide our examination of the defendants' rebuttal evidence. We consider first the defendants' explanation of the Department's promotional practices and Koren's refusal to promote Ms. Brooks. Second, we consider the defendants' justification for the wage disparity between the plaintiff and Ralph Butler.

After Ms. Brooks established a prima facie case, the defendants faced the burden of *producing* a reason for their actions, legitimate and nondiscriminatory on its face. The defendants introduced Director Koren and Department Supervisor Janet Tomko to testify to the Department's legitimate reason for not promoting the plaintiff. Director Koren testified that he did not promote the plaintiff because of her poor attitude. He considered her abrasive and judgmental toward clients. Toward the clerical staff she donned a "superior attitude." He also explained the unwritten criteria which he used in making promotion decisions and indicated that under these criteria the plaintiff was not suitable for promotion to supervisor. Janet Tomko corroborated Koren's testimony with her evaluation of the plaintiff. Tomko had been employed by the Department since 1970, with a year off in 1972–1973, and had been the plaintiff's su-

pervisor from 1976 to 1979. Tomko testified that Ms. Brooks' performance and temperament were "uneven" and that she displayed an intolerant attitude toward clients. Tomko stated that she would not recommend the plaintiff for promotion.

The district court ruled, "Defendants offered no evidence to rebut the legally mandatory presumption of sex discrimination with regard to the terms, conditions, and privileges of employment, or assignment of job classification, for the years 1970 to 1975." Memorandum Opinion, at p. 18. The court explained:

> The only evidence presented with regard to Brooks' ability or inability to get along with people was Koren's own testimony. This testimony was sufficiently discredited by Schullery's favorable evaluations and recommendations . . . , as well as Koren's own admission that he had no evidence to support his claim that he had received complaints about Brooks. Tomko's testimony is not relevant to this time period. . . .
>
> *      *      *      *      *      *
>
> This disparity in treatment [between Ms. Brooks and men in the Department] directly results from the fact that promotional decisions were within the sole discretion of the Director, John Koren. During the relevant time period, the Department used no regular, written evaluations of its employees, or any other objective means by which to determine the employees best qualified for periodic promotions. . . .

Memorandum Opinion, p. 20–21. Despite the fact that the plaintiff offered no evidence either initially or in rebuttal to show that Koren's explanation was pretextual, or that her personality was suitable for a supervisory promotion, the district court found she had proved the Department's intent to discriminate by a preponderance of the evidence.

■ The district court committed two legal errors, the effect of which was to relieve the plaintiff of her lawful burden of proving discrimination. First, the court misapplied the *Burdine* standard. The court quoted all the pertinent passages from *Burdine* on a defendant's burden once a *prima facie* case is established. Nonetheless, the court effectively required the defendants not only to *produce* a legitimate reason for their actions, but also to *prove* that this reason in fact motivated Koren. Koren and Tomko testified to Ms. Brooks' abrasive personality and her inappropriateness for a supervisory position. Thus, the defendants "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094. The defendants' justification pushed the factual inquiry "to a new level of specificity" and framed the issue with "sufficient clarity" for the plaintiff to have an opportunity to demonstrate pretext. *Id.* Instead of assessing the defendants' justification in this new light, the court tested the justification for its credibility, veracity, and persuasiveness. The court found itself unpersuaded by the defendants' explanation and concluded, "Defendants offered no evidence to rebut . . . ." In short, the court placed on the defendants the impermissibly heavy burden of persuasion and relieved the plaintiff of the burden of proof imposed by *Burdine.*

■ The district court's finding of discrimination in the policies and practices of the Department is erroneous for a second reason. The language of the opinion suggests that unwritten promotional policies and promotions not based upon objective evaluations of merit are *per se* discriminatory. We are mindful of our decision in *Abrams v. Johnson,* 534 F.2d 1226 (6th Cir. 1976), in which we stated: "Absolute discretion over employment decisions where subjective race prejudice may control . . . is no longer consistent with our law." *Id.* at 1231 (citations omitted). However, in that case, the promotional system itself was considered to determine whether the plaintiff had established a *prima facie* case; the action was remanded for the government to "go forward with proofs which seek to meet the legitimate, nondiscriminatory rejection standard set forth in *McDonnell Douglas*." *Id.* In *Abrams,* we did not deny the de-

fendants an opportunity to present a legitimate nondiscriminatory reason for their action; we intended no such irrebuttable presumption of discriminatory intent based on the plaintiffs' showing of a system of unwritten personnel policies. In the present case, the district court unduly emphasized the fact that the Department had no written promotion policies and that Koren had ultimate responsibility for all decisions without the benefit of objective merit evaluations. While these facts are important in evaluating the defendants' motivation, they cannot deprive the defendants of a fair opportunity to explain the legitimate reasons for the Department's promotional decisions. In depriving the defendants of an opportunity to rebut the *prima facie* case, the court relieved the plaintiff of her ultimate burden of persuasion in violation of *Burdine.* For these reasons, we reverse the district court's finding that the defendants discriminated against the plaintiff with respect to terms and conditions of employment and in job classification and assignment.

The defendants also produced an explanation for the wage differential between the plaintiff and Ralph Butler. Director Koren explained that Butler had lost his position with the Ohio Bureau of Employment Services because of a statewide patronage purge. After Koren determined that Butler's qualifications fit a need of the Department, he hired Butler at a pay level equal to Butler's former wages. The parties stipulated that Butler's beginning pay with the Department was $339.20 biweekly. A "transfer form" indicating Butler's pay was $339.20 both before and after the transfer corroborates the stipulation. Koren testified that Butler's rate of pay had been "worked out with the State Department of Personnel." Furthermore, Koren and Tomko both stated that Butler's responsibilities were greater and his work more complex than the plaintiff's. The defendants maintained that the pay differential was nondiscriminatory and based upon legitimate business reasons.

In assessing the defendants' explanation of the wage disparity between Brooks and Butler, the district court found that the defendants had articulated a legitimate, nondiscriminatory reason for the inequality. The plaintiff offered no rebuttal testimony other than a request that the court consider a state statute discussing transfers, which statute the court found not applicable. The court rejected the defendants' reason, stating:

> Had Butler been *"transferred at his same rate of pay,* which in itself was higher than that of Brooks, the situation might be different. *Because his salary was increased,* the Court finds, upon considering all of the evidence demonstrating that the better paying positions were held by male employees, that the pay differential was based on sex in violation of Title VII.

Memorandum Opinion, at p. 24–25 (emphasis added).

■ The court's conclusion of liability here is based on a clearly erroneous factual finding. Butler's salary was *not* in fact increased when he transferred from another state employer; his biweekly salary both before and after the transfer was $339.20. Obviously, given the court's enunciated premise, *supra,* its finding of discrimination is based solely upon this erroneous factual conclusion. Accordingly, we reverse its finding of liability for sex discrimination based on unequal wages.

■ Because we have reversed the district court's assessment of liability under Title VII, we must also reverse the finding of sex discrimination in violation of 42 U.S.C. § 1983. The court relied on its conclusion that the defendants had intentionally treated Ms. Brooks less favorably than male employees in the Department to support a finding of intentional discrimination under section 1983. 42 U.S.C. § 1983. Therefore, to reverse the former is to reverse the latter. Consequently, we do not reach the defendants' argument that the court's reliance on Title VII liability to find section 1983 liability violated the dictates of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

In view of our holding, we also need not reach the issue of whether the district court properly applied *Hazelwood.* We do note that *Hazelwood* provides for special circumstances under which pre-Act discrimination, that is, discriminatory acts occurring before the effective date of Title VII, March 24, 1972, may have probative value for post-Act conduct. *Hazelwood,* 433 U.S. at 309, n. 15, 97 S.Ct. at 2742, n. 15. The court below found that most relevant aspects of the decision-making process in the Department remained constant throughout the pre- and post-Act period. Based upon this finding, the court considered not only the unchanged departmental policies as evidence of sex discrimination but also pre-Act statistics, data, and events. The court also assessed back pay liability through July, 1971. We find the court's interpretation and application of *Hazelwood* somewhat expansive. However, we need not decide the issue of the appropriate probative weight to attach to pre-Act conduct.

Judgment reversed.