**Elizabeth Y. MILLS, Plaintiff-Appellee,**

v.

**FORD MOTOR COMPANY, Defendant-Appellant.**

No. 85–5945.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 8, 1986.

Decided Sept. 11, 1986.

Jon L. Fleischaker (argued), Kimberly K. Greene, Mark D. Wilson, Wyatt, Tarrant and Combs, Louisville, Ky., for defendant-appellant.

Frank E. Haddad, Harris J. Berman, (argued), Louisville, Ky., for plaintiff-appellee.

Before MARTIN and JONES, Circuit Judges, and COHN,* District Court Judge.

NATHANIEL R. JONES, Circuit Judge.

Defendant Ford Motor Company appeals from a district court judgment finding that it discriminated against the plaintiff on the basis of sex in violation of Title VII, 42 U.S.C. § 2000e *et seq.* (1982). The issue on appeal is whether the district court properly applied the test for determining whether an employer has intentionally discriminated. We find that it did and affirm the district court's judgment.

Plaintiff Elizabeth Mills, a white female, was forty years old in 1977 when she was hired as a production supervisor in the body shop at Ford's Louisville Assembly Plant. Based on her performance in the body shop she received an evaluation rating her overall performance as "very good." Approximately three months after coming to Ford, she was transferred into the passenger division of the Trim Department as a line supervisor. When she was transferred there were approximately twenty male supervisors and no female supervisors in the department.

Ford evaluated the performance of its line supervisors on the following scale: Outstanding, Excellent, Satisfactory Plus, Satisfactory, Satisfactory Minus or Unsatisfactory. Mills received her first performance evaluation in October 1977. Her performance was rated as a "satisfactory plus," but the evaluation did indicate certain deficiencies in the areas of quality, costs, housekeeping, safety glass program and production.

In November 1977, the Trim Department began operating on two shifts instead of one. Each shift was allotted the same number of jobs per hour. Meanwhile, in July 1978, Ford brought in new supervisory personnel to implement a major model change in its passenger cars. Lou Renfro was demoted from Superintendent to General Foreman. He was replaced as Superintendent by Larry Pickles. Mills testified that Pickles rarely discussed any problems in her department with her; rather if she had problems, Pickles would discuss them with a male foreman who was not in charge of her department. On August 21, 1978, she received a second performance

---

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

evaluation, signed by Pickles, which gave her an overall rating of satisfactory. This evaluation also indicated that she had certain deficiencies.

Ford began suffering economic problems. On April 24, 1979, Ford announced that its night shift in the passenger division of the Trim Department would be eliminated in three weeks. The Trim Department only operated a total of fifty-two working days from January 1, 1979 until June 1, 1979. The day following Ford's announcement that the second shift would be eliminated, Mills received a third evaluation. She was given a rating of unsatisfactory and was again considered deficient in the areas of costs, quality, production, housekeeping and safety. The evaluation further indicated that she would be given guidance and direction with a follow-up review in thirty days. Renfro, the General Foreman, and Pickles, the Superintendent, signed the evaluation.

From April 25, 1979 through June 1, 1979, Mills was on active duty as a supervisor for only seven days. She testified that she was given counseling for only five minutes during that period. A fourth and final evaluation of Mills was signed by Renfro and Pickles on June 1, 1979. Mills was again given an overall performance rating of unsatisfactory. The report indicated that Mills had received "continuous counseling and assistance for prolonged periods of time" and although she showed slight improvement, her performance remained far less than satisfactory. The report again criticized Mills' performance in the areas of cost, quality, housekeeping and safety. It also recommended that Mills be terminated. That recommendation was reviewed by Ford's Industrial Manager, Thomas Ryan, and by other Ford personnel in Dearborn, Michigan, and Mills was terminated sometime thereafter.

Ford had a policy where all supervisors who received two less than satisfactory performance ratings were terminated. In addition to Mills, five male production supervisors who received less than satisfac-

tory performance ratings were also terminated.

Mills argued before the district court that the performance evaluations were completely fabricated and that she was terminated solely on the basis of her sex. The district court tried the case without a jury and agreed with Mills. Ford moved to reconsider the judgment on the ground that the district court improperly found sexual discrimination without requiring Mills to prove that there were similarly situated males who were treated differently. The district court vacated the original judgment and granted further discovery on the issue of comparable treatment. Following discovery, the district court again found that Mills suffered sexual discrimination and entered a judgment in her favor. She was awarded back pay in the amount of $100,-715.38, attorney's fees, and reinstatement to her former position. Ford appeals from that judgment.

### I.

A Title VII case of sexual discrimination must be analyzed under the three prong test articulated by the Supreme Court in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff carries the burden of establishing a *prima facie* case. 450 U.S. at 252–53, 101 S.Ct. at 1093–94. If she establishes a *prima facie* case, the defendant must then articulate a nondiscriminatory reason for its actions. *Id.* If the employer does this, the burden is again on the plaintiff to prove that the articulated reason was pretextual and not the true reason, either by showing that a discriminatory reason was the more likely motivation, or by showing that the articulated reason is unworthy of belief. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *Grubb v. W.A. Foote Memorial Hospital, Inc.*, 741 F.2d 1486, 1493 (6th Cir.1984), *vacated on other*

*grounds* 759 F.2d 546, *cert. denied,* —— U.S. ——, 106 S.Ct. 342, 88 L.Ed.2d 289 (1985); *Grano v. Department of Development,* 637 F.2d 1073, 1079 (6th Cir.1980). The plaintiff must ultimately prove that the defendant intentionally discriminated against her. 450 U.S. at 253, 101 S.Ct. at 1093.

Ford first challenges the district court's finding that Mills established a *prima facie* case of discrimination. Specifically, it argues that Mills never produced evidence of similarly situated males who were retained. The district court, in its opinion, considered and compared the performance records of five male supervisors who were fired because of unsatisfactory evaluations. It found that the performance records of all five supervisors were objectively worse than Mill's performance records. It also found that these supervisors received counseling before and after unsatisfactory reviews whereas Mills received, contrary to the information in the final performance evaluation, only five minutes of counseling. Ford does not vigorously dispute this finding but argues that records of these supervisors were not germane to the *prima facie* analysis—only records of male supervisors with comparable work records who were not discharged, it argues, should be considered.

 Ford submits that Mill's *prima facie* case should be analyzed under the four step paradigm set forth in *McDonnell Douglas.* As that case dealt with a failure to hire claim rather than a discriminatory discharge claim, Ford admits that the only differing element in the paradigm is the fourth step. Ford suggests that the fourth element be adopted from other discriminatory discharge cases. Together, those four elements are:

1) that she belongs to a protected class,

2) that she was satisfactorily performing her job,

3) that despite this performance she was terminated, and

4) *that she was replaced by a nonminority or workers with comparable*

*work records were retained while she was terminated.*

(Emphasis added). *See Grubb v. W.A. Foote,* 741 F.2d at 1493; *Wade v. New York Telephone Co.,* 500 F.Supp. 1170, 1174 (S.D.N.Y. 1980). *See also Becton v. Detroit Terminal of Consolidated Freightways,* 687 F.2d 140, 141 (6th Cir. 1982), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1432, 75 L.Ed.2d 791 (1983); *Flowers v. Crouch Walker Corp.,* 552 F.2d 1277, 1281–82 (7th Cir.1977).

If the district court applied this *prima facie* test to this case in the manner suggested by Ford, Mills would be faced with an insurmountable burden. The bases for Mills' complaint of discrimination were the evaluations signed by Renfro and Pickles. She claims her unsatisfactory performance ratings were not correct and were only given because she was a woman. If she must prove that other similarly situated supervisors who also received unsatisfactory ratings were retained, she is faced with the task of proving that Ford did not uniformly adhere to its policy of dismissing unsatisfactory performers. That is not the appropriate inquiry here. She is not arguing that Ford did not dismiss other line supervisors who received unsatisfactory performance evaluations; she is arguing that she never should have received unsatisfactory ratings in the first place and that Renfroe and Pickles possessed a discriminatory motive when giving Mills her evaluations.

We believe that the district court analyzed the *prima facie* case properly in this case. The district court did not consider the records of the five discharged males for the purpose of determining whether Mills established her *prima facie* case. It considered them only to show that Mills' performance records were objectively better than those of the males discharged. In considering the *prima facie* case, the district court made specific reference to the fact that the supervisor on the second shift remained to do the same work previously done by Mills. There were also time sheets introduced into evidence that Mills had the

same production level over a six month period as the supervisor on the second shift and used considerably less employee hours to do so. Moreover, there was evidence by lower-level employees that Mills was performing her job as well as or better than her male counterparts who were retained.

■ Contrary to Ford's position, *McDonnell Douglas* does not require that the identical *prima facie* analysis be used in every discriminatory discharge case. As the Supreme Court has explained, the *prima facie* proof required by a plaintiff in a Title VII case may differ with each factual situation. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 575, 98 S.Ct. 2943, 2948, 57 L.Ed.2d 957 (1978). *See Beaven v. Commonwealth of Kentucky,* 783 F.2d 672, 676 (6th Cir.1986). All the plaintiff must establish at the *prima facie* stage is that her discharge raised an inference of discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Time sheets and nonsupervisory testimony may ostensibly not be the ideal proof in establishing a *prima facie* case, but in this case they are enough to establish at least an inference of discrimination. We are ever mindful that the *prima facie* burden is not a heavy one, *Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94, and the proof need not be conclusive.

## II.

Once a plaintiff has established a *prima facie* case, the defendant must articulate a nondiscriminatory reason for the discharge. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. *See West v. Fred Wright Construction Co.,* 756 F.2d 31, 33–34 (6th Cir.1985); *Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370, 375 (6th Cir.1984). Although the burden of production shifts to the defendant, the burden of persuasion always remains with the plaintiff. *Jackson,* 743 F.2d at 375. Ford contends that the district court not only required it to articulate a nondiscriminatory reason but also to prove that reason. Twice in the opinion, the district court stated that Ford articulated a legitimate, nondiscriminatory reason for Mills' discharge and that Ford

was entitled to rely on the performance evaluations as reason for the discharge. However, in its opinion, the district court made note of the fact that Mills was the only party to present evidence comparing the performances of supervisors on the different shifts. Additionally, it placed some significance on Ford's decision not to produce Renfroe and Pickles as witnesses.

Ford relies on *Brooks v. Ashtabula County Welfare Department,* 717 F.2d 263 (6th Cir.1983), *cert. denied,* 466 U.S. 907, 104 S.Ct. 1687, 80 L.Ed.2d 160 (1984), where this court held that the district court erred when it rejected the defendant's articulated nondiscriminatory reason because the defendant offered no evidence to rebut the plaintiff's *prima facie* case. The district court incorrectly placed the defendant with the burden of proving that it was motivated by the nondiscriminatory reasons in not promoting the plaintiff. *Brooks* is, however, factually different from the case here. In *Brooks,* the plaintiff offered no evidence to show that the defendant's reasons were pretextual. Instead, the district court tested the defendant's justification for its "credibility, veracity, and persuasiveness" independent of the plaintiff's inability to produce proper evidence. In this case, Mills did present her own evidence in the third stage that was weighed by the district court.

■ Whatever significance is attached to the district court's reference to Ford's decision not to produce certain evidence, we believe it has no bearing on the district court's acceptance of Ford's articulated nondiscriminatory reason for Mills' discharge. The district court stated quite clearly that Ford had produced a legitimate nondiscriminatory reason. Any references to the defendant's lack of proof were simply additional evidentiary factors considered in evaluating whether that nondiscriminatory reason was pretext. Given that Mills did present evidence of pretext, the district court was permitted to place some weight on Ford's failure to present evidence and call Renfroe and Pickles as

witnesses in the third stage of the Title VII analysis.

## III.

■ The district court observed that the question of whether Ford's proffered non-discriminatory reasons for discharge were pretextual was a close one. In concluding that Mills proved her claim of sexual discrimination, the district court did not rely on any one fact as determinative but weighed a number of facts in deciding in favor of Mills. It based its decision on the following offers of proof: 1) employees testified that Mills performed her job in a satisfactory manner; 2) Mills received virtually no counseling, and Renfroe and Pickles paid very little attention to her and; 3) time sheets showed Mills was performing her job with substantially less employee hours than her male counterparts.

One former supervisor on the second shift, James Railes, testified that Mills' problems with clean-up or safety glasses were no different than the problems he had. Assuming each supervisor was rated on substantially the same relative criteria, this testimony tends to indicate that Mills' problems in the area of housekeeping and safety were no different than any other supervisor and based on a relative scale should not have formed the basis for an unsatisfactory review. A number of other employees also testified that Mills enforced the safety rules and maintained her area as cleanly as any other supervisor. The significance of the testimony of these employees would be lessened had there been evidence that Renfroe and Pickles spent any time with Mills observing her performance. To the contrary, there was evidence that Pickles rarely came to Mills' area and never discussed matters with her. Moreover, there was evidence that Renfroe paid very little attention to Mills. It is true that these employees may not have been in the best position to evaluate Mills' performance. But given the evidence concerning the lack of attention paid to Mills by the proper supervisory personnel, there was good reason for the district court to give considerable weight to the employees' testimony.

The district court also accorded significant weight to the time sheets introduced by Mills comparing the employee hours used by the supervisors on each shift. It acknowledged that there was a problem with this proof because there are a number of variables affecting production besides employee hours. These variables include "availability of materials, mix of units, volume of the day, use of equipment, and number of available hourly employees," which may be different on each shift. Even assuming this to be true, Ford does not argue that lower employee hours are something it does not encourage, and thus they can be viewed as a factor in assessing production performance. We agree with the district court that this proof, although not perfect, has some degree of probative value.

The ultimate question, of course, is whether the district court was clearly erroneous in relying on this evidence as proving that Ford's reasons for discharge were pretextual. Evaluated independently, each of these offers of proof is not dispositive of the ultimate issue of whether Ford intentionally discriminated against Mills on the basis of sex when it discharged her. However, we cannot say that when viewing the evidence as a whole, the district court was clearly erroneous in finding that Ford possessed discriminatory motives when discharging Mills.

The judgment of the district court is, therefore, AFFIRMED.