**John F. EDWARDS, Plaintiff,**

v.

**John MARSH, Secretary of the Army, Defendant.**

No. 85–CV–72578–DT.

United States District Court,
E.D. Michigan, S.D.

Oct. 14, 1986.

Chui Karega, Detroit, Mich., for plaintiff.

Geneva Halliday, Asst. U.S. Atty., Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ZATKOFF, District Judge.

This is a race discrimination case brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16. The case was tried without a jury before the Court on September 17th, 18th and 19th, 1986. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court hereby sets forth its essential findings of fact and conclusions of law thereon.

During the hearing, the Court had the opportunity to and did take into account, each witnesses' ability and opportunity to observe the events to which they testified; his memory and manner while testifying, any interest, bias or prejudice the witness may have had, and the reasonableness of the witnesses' testimony considered in light of all the evidence in the case. The Court took into consideration all of the foregoing in determining the credibility of all witnesses testifying in this matter.

By way of his complaint, plaintiff, a civilian employee of the United States Army contends that he was passed over for promotion to a high supervisory position on account of his race. Defendant asserts that the nonselection of plaintiff for the promotion was made pursuant to legitimate nondiscriminatory considerations. In order to adequately set the stage for the relevant occurrences at issue, a brief history of plaintiff's employment is appropriate.

Plaintiff John F. Edwards, a black male, has served the United States Government in various capacities for close to thirty years. He began his career as a postal clerk in Chicago in September, 1957. Edwards continued with the Postal Service until his transfer to the Department of the Army in January, 1966. At that time, he undertook a career change, commencing an internship in Army Supply Management. Generally speaking, supply management encompasses the procurement, management and distribution of parts and supplies to Army field units. In October of 1966, Edwards began a formal supply manage-

ment intern training program consisting of approximately 70 percent classroom work and 30 percent rotational job training. In September, 1967, Edwards completed the management intern program and was assigned to the U.S. Army Tank-Automotive Command (TACOM) in Warren, Michigan. He has remained employed at TACOM since that time and continues to be employed there today.

The relevant time frame for purposes of the instant dispute begins around 1980. At that time, Edwards was employed in the Supply Management Branch of the Logistics Management Division of the Office of the Program Manager, M-1 Abrams Tank System, U.S. Army Tank-Automotive Command (TACOM). Besides the Supply Management branch of this TACOM Division, there were also two other branches; the Maintenance Branch and the Fielding Branch. Edwards, in the 1980 time frame, was employed in the Supply Management Branch as a Supply Representative (GS level 13). His supervisor was Edward Walters, the Chief of the Supply Management Branch. Walters' supervisor, in turn, was Colonel Joseph Raffiani, Jr., who was the Chief of the entire Logistics Management Division and the three aforedescribed Branches comprising it.

Edwards served ably in his position of Supply Representative. In the late 1980 through 1982 time period, Edwards was involved with the production coordination and procurement of parts for the turbine engine unit of the M-1 Abrams Tank. Edwards also served with the Parts Allocation Board as an "Action Officer." In this capacity, Edwards helped ensure that the Board's recommendations concerning the allocation of parts to Army field units were effectuated. Edwards' performance appraisals further demonstrated his competency. While never receiving the highest possible performance rating (exceptional), Edwards nevertheless generally received the second highest performance rating (highly successful).

In August, 1981 certain events precipitating the subject job opening ensued. At that time, the Chief of the Supply Management Branch (and Edwards' supervisor), Edward Walters, became ill and began experiencing difficulties in performing his duties as Chief. Walters notified his supervisor, Colonel Raffiani, of his medical problems and, in September, 1981, requested a transfer to another less-stressful division of the Army. Walters nevertheless remained in his job capacity as Chief of Supply Management.

Between September and December of 1981, Walters' performance deteriorated. Walters was unable to adequately perform his duties as Chief and was often absent from work or from various meetings. As a result, in December 1981, Colonel Raffiani requested a referral list of qualified candidates to replace Walters when and if his transfer application was processed.

During the pendency of Walters' transfer request, Colonel Raffiani also made personnel adjustments in the Chief of Supply Management Position. In or around December-January 1981–82 Colonel Raffiani created a temporary "special assistant" position whereby Walters would retain some limited Supply Management Chief duties and also assist Raffiani in various miscellaneous matters. Walters' position, in turn, was temporarily filled by Major John Houlihan, an Officer from the Fielding Branch of Logistics management who had previously held the Supply Branch Chief position for approximately a two year period.

Major Houlihan's appointment to Acting Chief of Supply Management was strictly temporary until a permanent personnel decision was made on Walters. As a result of his background, Major Houlihan was well-qualified for the Acting Chief position, having previous experience in both the retail and wholesale aspects of Supply Management. Retail supply is the logistical or supply system at the army divisional level. It is the system with which the soldier in the field deals. In contrast, wholesale supply is the logistical or supply system which operates at the army depot or manufacturer's level. It is the organiza-

tion that actually produces and stocks parts and supplies in order to support the field retail system. The Chief of Supply Management deals extensively with both the retail and wholesale aspects of supply.

By March or April of 1982, no formal personnel decision had yet been made with respect to Edward Walters. At the same time, Walters was experiencing medically-related problems in his position as assistant to Colonel Raffiani. As a result, Walters applied for a medical disability retirement and went on extended sick leave at this time.

During the pendency of Walters' medical disability request, Major Houlihan continued to occupy the "Acting Chief" of Supply position. From time to time, plaintiff Edwards would assist Major Houlihan in the performance of various routine duties while the latter was out of the office.

In or around November, 1982, Walters' medical disability request was denied. Colonel Raffiani then turned to civilian personnel in an attempt to find an expeditious replacement for Walters. Raffiani again requested a list of qualified candidates for the Chief of Supply Management position and continued, in the interim, to utilize Major Houlihan in the Acting Chief position.

The referral list of qualified candidates was received by Colonel Raffiani in January or February of 1983. The list contained approximately twenty candidates who were all rated as eligible and highly qualified to replace Walters as Chief of the Supply Management Branch. Among those listed were plaintiff John F. Edwards. Utilizing this referral list, Colonel Raffiani conducted interviews of the applicants and rated each candidate utilizing a matrix which indicated an average score based on Raffiani's appraisal of each candidate in various relevant areas. Based on the results from the matrix scores, Thomas

Boyle was selected as the successor to Walters in the Chief of Supply position.[1]

Plaintiff Edwards thereafter filed an Equal Opportunity grievance, contending that he was not selected for the Chief of Supply position because of his race. Following unsuccessful administrative proceedings, the instant complaint was filed on June 10, 1985.

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972), the Supreme Court outlined the order and allocation of the burden of proof for an individual claim of employment discrimination under Title VII. *McDonnell Douglas* involved allegations of race discrimination in the failure to hire blacks for entry level jobs. The Court held that the plaintiff in a Title VII action has the initial burden of establishing a prima facie case of discrimination by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open, and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824.

While the *McDonnell Douglas* analysis has been adapted and applied to many other fact patterns, it should not be applied mechanistically. *United States Postal Service v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Thus, in a case involving a failure to promote, the elements of a prima facie case are: (1) that plaintiff belongs to a minority group; (2) that plaintiff applied for a promotion for which he was qualified; (3) that plaintiff was denied the promotion while others who were similarly qualified, but who were not members of the protected group, were promoted. See *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C.Cir.1981).

---

1. Actually, another candidate Ronald H. Vogt received the highest score on Raffiani's matrix evaluation. However, for reasons which were not disclosed at trial, Vogt did not or could not accept the appointment as Chief of the Supply Branch. As a result, the position was awarded to Boyle, who had received the second highest score.

■ If the plaintiff is able to establish a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). In the final step, plaintiff has an opportunity to demonstrate that the employer stated reason was merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. at 1825. In this regard, although the burden of production shifts to the defendant, the burden of persuasion always remains with the plaintiff. *Mills v. Ford Motor Co.*, 800 F.2d 635 (6th Cir.1986).

■ As the Court held in its denial of defendant's motion for directed verdict, plaintiff Edwards has established a prima facie case of Title VII race discrimination. Edwards is a black man, a minority, who applied for a promotion for which he was qualified. The fact that Edwards was qualified for the Chief of Supply Management job was alluded to by the Government in counsel's opening statement and is further evidenced by plaintiff's presence on the referral lists of qualified candidates from which Colonel Raffiani eventually selected Walters' replacement. Finally, the subject job opening was ultimately awarded to another candidate from the referral list, Thomas Boyle, a nonminority. Thus, the burden of production shifts to the Government in this case to articulate a legitimate nondiscriminatory reason for the promotion of Boyle over Edwards.

Turning to the reasons advanced by the Government for this personnel decision, it is at once clear that ample justification for the selection of Boyle exists. At the time the Chief of the Supply Management Branch was selected the M–1 Abrams Tank had just recently began production. Within TACOM, there was a major shift in emphasis from research and design to the actual production and fielding of the Tank. Consequently, it was essential that the successor to the Chief of Supply post be knowledgeable in and, preferably, have hands-on experience in field supply systems (i.e. retail supply) in order to effectively cope with the unique and multifaceted problems anticipated.

Regarding the necessity of retail supply experience, Colonel Raffiani testified that management problems in retail supply differed greatly from management problems in wholesale supply. Colonel Raffiani testified that, due to the intensive fielding of the M–1 tank, a broad perspective, including practical retail supply experience, was a relevant and legitimate hiring consideration. Similarly, the testimony of Major Houlihan indicated that retail supply experience was important for the Chief of Supply job in order to maintain credibility and sensitivity with Army field troops. The testimony of Lieutenant Colonel Michael Newman, Division Chief from July 1984 through July 1986, was in accord with that of Colonel Raffiani and Major Houlihan. Although plaintiff downplays the relevance of retail supply experience, the testimony of Raffiani, Houlihan and Newman is compelling. Furthermore, the Court finds the testimony of these witnesses highly credible on this issue. Without further belaboring the issue of retail supply experience, suffice it to say that the Court finds it a relevant consideration for the Chief of Supply position.

To this end, Colonel Raffiani prepared a list of relevant candidate attributes, including among them the presence or absence of retail supply experience. In addition, Raffiani also included other job-related criteria including each candidate's qualification record, his prior evaluations (SKAP scores), innovativeness, wholesale supply experience, ability to work under stress, supervisory experience, aggressiveness, and awards. The above criteria (among other criteria) were then placed on a chart matrix. Each candidate was assigned a 1–10 score in each category (in many instances based solely on objective factors) and the scores were totalled. Thomas Boyle received a higher total score than plaintiff Edwards.

Reviewing the criteria utilized by Colonel Raffiani on the selection matrix, the Court finds the same to be reasonable and job-related. Also, as noted above, in many cases, the score in an individual category was based on objective not subjective criteria. To the extent that the matrix utilized subjective criteria such as "attitude," the Court notes that plaintiff's scores and Boyle's scores are similar—consistent with both of their names having been referred to Colonel Raffiani by personnel as among 20 or so qualified candidates. In short, there is nothing inherently suspicious about the matrix utilized nor were there any clouds cast over its validity during trial. To the contrary, the Court finds that the evaluation matrix sets forth legitimate, nondiscriminatory job criteria.

The one category in which plaintiff, Edwards, scored significantly lower than Thomas Boyle is in the area of Retail Supply experience. In this connection, however, Edwards himself testified that he had *no* prior retail supply experience aside from occasional telephone calls to Army field units. In contrast, Thomas Boyle's score in the Retail Supply category directly reflects his significant range of experience in that aspect of Logistics Supply Management. The undisputed evidence on this point reveals that Boyle worked directly with retail supply operations for approximately five years in Korea while serving as an intermediary between wholesale and retail logistics operations. This fact coupled with the Court's finding that such experience in retail was a relevant criteria herein, renders Boyle clearly superior in this category.

Simply stated, then, the disparity in scores between plaintiff Edwards and Boyle largely boils down to a lack of retail experience on the part of Edwards.[2] The Court, though, finds that such experience is a reasonable job criterion, and that Colonel Raffiani's selection process on the whole was thoroughly and equitably planned. Defendant has, therefore, articulated a legitimate nondiscriminatory reason for its decision not to promote Edwards to the Chief of Supply Management post. Defendant's burden of production being duly satisfied, it is therefore incumbent on plaintiff to prove that the explanation proffered by defendant is mere pretext for unlawful behavior. In other words, plaintiff has the burden of proving that he was the victim of race discrimination. *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 375 (6th Cir.1984). In this case, there is a remarkable dearth of evidence on the race discrimination issue.

Plaintiff Edwards testified on direct examination and on rebuttal that he should have received higher scores in several areas of Colonel Raffiani's matrix evaluation. To the extent that Edwards feels that he should have scored higher in the retail supply area, the Court finds his assertion entirely without merit. As mentioned before, plaintiff's lower score in this area is overwhelmingly justified, particularly in light of the fact that he *did* receive five out of a possible ten points for retail supply experience *despite* having no practical experience in this area whatsoever. Edwards' personal opinion that hands-on experience in retail supply was not necessary is simply not persuasive.

Similarly, although plaintiff claimed that he should have scored higher in the areas of combat vehicle experience, working with higher headquarters and working under pressure, he completely failed to show how his experience in these areas *surpassed* that of the other candidates, particularly Mr. Boyle. Moreover, in the areas of working with higher headquarters and working under pressure plaintiff scored at or near

---

**2.** Despite Edwards' lack of hands-on retail experience, however, it is significant that he did receive substantial "credit" in the retail category for his apparent knowledge of retail operations to some extent.

The Court also points out that Edwards scored lower than Boyle in his performance evaluations (SCAP scores). However, these scores were determined in an exclusively objective manner relying on the previous independent evaluations of a board of examiners at the Department of the Army Headquarters.

the level attained by Boyle. Oddly enough also is the fact that Edwards attained the highest possible score in the area of combat vehicle experience. Likewise, in the area of awards received, although Edwards testified that he had received more awards than Boyle, cross-examination revealed that he, in fact, had not. In short, there is an appalling lack of testimony to the effect that the evaluation matrix was applied in anything but an objective, reasonable and fair manner.[3]

Notwithstanding the absence of any basis for plaintiff's bare allegations concerning the evaluation matrix, a much greater and wholly dispositive difficulty looms over his case. Even if plaintiff had demonstrated an arguable entitlement to a higher matrix evaluation score, he has failed to demonstrate any facts capable of giving rise to even an inference that Colonel Raffiani's decision not to assign him a higher score was motivated by racial animus. Yet, obviously, evidence of this very nature is the essential cornerstone of any Title VII case that asserts illegal race discrimination. At trial, no witness, not even the plaintiff himself, testified to any events involving discrimination by Colonel Raffiani against black persons. In addition, no witness testified as to any remarks or statements made by Raffiani which would indicate a dislike for black persons or an intent on his part to treat black persons differently than any other subordinate.

Edwards would have the Court infer race discrimination by the fact that Colonel Raffiani *could have* appointed him as the "Acting Chief" rather than appoint Major Houlihan to this position. Edwards also asserts that Houlihan's appointment violates an Army regulation limiting noncivilian employees to 90 days of temporary service absent a request to the contrary. Never-theless, the unrebutted record indicates that the appointment of Edwards would have created a vacancy within the Supply Management Branch for which no replacement could be immediately retained. This coupled with the fact that Houlihan had actually held the Chief of Supply position for two years previously indicates that the decision to temporarily appoint him was reasonable and prudent and preferable to the temporary appointment of Edwards. Moreover, the unrebutted expectation of Colonel Raffiani of an impending transfer of Edward Walters as well as Raffiani's lack of knowledge of any Army 90 day regulation at the time renders Edwards' reliance on any such regulation irrelevant. Even more so, Edwards has completely failed to introduce any evidence indicating that any part of the actions taken with respect to Major Houlihan's temporary assignment were racially motivated.

Edwards would also have the Court infer that the *absence* of Raffiani's secretary during Edwards' interview indicates an intent to hide the events occurring therein. In this regard, Edwards notes that Raffiani's secretary was present during the interviewing of other candidates. Once again, however, the unrebutted testimony reveals that Edwards and Raffiani's secretary, unlike any of the other candidates, were from the same office and that her exclusion from the interview room was required in order to allow Edwards to comfortably answer several highly personal and potentially "awkward" questions which Raffiani propounded to all the candidates. More startling, however, is that Edwards has introduced no evidence indicating that any improper or race-related questions or actions were a part of the interview.

---

**3.** Plaintiff also testified that he possessed superior experience in the Supervisory category because of the 1000 or so hours that he had filled in for Major Houlihan as Chief of Supply. The unrebutted testimony of record, however, indicates that plaintiff merely assisted in performing various routine administrative chores usually performed by the Chief of Supply. It is also not insignificant that during these times, Houli-han was generally in the field on business involving retail supply—functions in which plaintiff did not participate. In short, plaintiff has not demonstrated how this common practice should have impacted on his evaluation. The fact is that plaintiff had no practical retail supply experience and no significant Chief of Supply experience.

It is plain, then, that Edwards has failed to meet his burden of proof on his Title VII claim.[4] This being the case, a judgment in favor of the defendant will be entered.

Aside from the merits of this case, however, the Court is deeply troubled by the total lack of evidence supporting plaintiff's case. Plaintiff offered no evidence in either his case in chief or rebuttal case indicating that he was discriminated against by virtue of the fact that he is a black man. Such a disturbing paucity of evidence is sufficient cause for this Court to examine the basis for the continued maintenance of the lawsuit up until the time of trial.

To be sure, there will be instances in which individuals such as plaintiff will be passed over for a particular promotion. In such a situation, it is not an uncommon experience for a person to feel that he was more deserving of that promotion or perhaps even more qualified than another person. Nevertheless, because there are often myriad considerations that accompany a hiring decision, particularly at a high supervisory level, the burden properly rests on a plaintiff to show some sort of impropriety in the decision in order to raise an inference of unlawful conduct. Admittedly, personnel decisions are often made, and necessarily so, with reference to both objective and subjective criteria. It is for this reason, though, that statutes such as Title VII were enacted to safeguard the personal liberties of the employee and the values of our free society.

Title VII serves as a check on the legitimate exercise of an employer's discretion vis-a-vis the "illegal" or improper exercise thereof. To this end, the statute promotes the national policy of equality of treatment between persons of different races, religions and the like. "The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and ... neutral employment and personnel deci-sions." *McDonnell Douglas Corp. v. Green, supra* at 411 U.S. 801, 93 S.Ct. at 1823. Consistent with this purpose, the *McDonnell Douglas* court delineated an allocation of the burden of production in a Title VII case that assists a plaintiff in overcoming the otherwise formidable barriers which he often faces. Once a plaintiff shows that he is a qualified minority person that was turned down for an employment position, the burden of production shifts to the employer to articulate a legitimate business reason for the hiring decision in lieu of requiring the plaintiff to prove that the hiring decision was *not* a legitimate business decision. *Id.* at 802, 93 S.Ct. at 1824. In this manner, the plaintiff is relieved of problems with access to proof and is, in essence, handed the keys to the federal courthouse door.

Nevertheless, the mere fact that an individual may hold the keys to the courthouse door does not imply that he may enter with disregard for his actions therein. Among other rules, every litigant in federal court is governed by the general proscription against the maintenance of baseless litigation:

Every pleading, motion and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name ... The signature of an attorney or party constitutes a certificate by him that he had read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation ... If a pleading, motion or other paper is signed in violation of this rule, the court, upon

---

**4.** Edwards also suggests that Raffiani's intent to discriminate against Black workers is demonstrated by the fact that Raffiani failed to present him with a 25–year service certificate on a time-ly basis. Since, however, Edwards suffered no ill-consequences as a result of this purported occurrence, the Court finds this argument frivolous and unworthy of further discussion.

motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Fed.R.Civ.P. 11.

■ Rule 11 was amended in 1983 to eliminate the requirement that there be a showing of subjective bad faith, and the standard now applicable is an objective one. The Rule now requires a reasonable inquiry to ensure that a complaint is well-grounded in fact and arguably supported by law. The Rule was amended "to reduce the reluctance of courts to impose sanctions ... by emphasizing the responsibilities of the attorney and reinforcing those obligations by the imposition of sanctions." Advisory Committee Note, Fed.R.Civ.P. 1 .... This standard is more stringent than the original good faith standard and the Rule will thus be triggered under a wider range of circumstances. *Id.* The standard is one of reasonableness under the circumstances and, when a violation of the standard occurs, the imposition of sanctions is mandatory. *Albright v. Upjohn Co.,* 788 F.2d 1217 (6th Cir.1986).

■ At the same time, however, mere lack of success on the merits alone does not justify the imposition of Rule 11 sanctions. *Kamen v. AT&T,* 791 F.2d 1006 (2d Cir. 1986). The Rule is not intended to chill an attorney's enthusiasm or his creativity in pursuing various theories. Advisory Committee Note, Fed.R.Civ.P. 11.

■ In this case, the Court concludes that, at a minimum, the complaint and final pretrial order were signed in violation of Rule 11. The record in this case contains absolutely no evidence on racial discrimination. Quite simply, this is a case of a disgruntled employee who was passed over for a promotion and who also happens to be a black man. No other inference is permissible.

Nor is this conclusion altered by the fact that the Court denied the defendant's motion for directed verdict at trial. That denial merely held that Edwards had established a Title VII prima facie case but had no bearing on whether or not he had introduced any evidence of race discrimination. As pointed out, *supra,* the establishment of a prima facie case under Title VII is no shortcut to proof; it is a mere allocation of the burden of production. The burden of proof in a Title VII case *always* remains with the plaintiff. *Mills v. Ford Motor Co.,* 800 F.2d 635 (6th Cir.1986). In this respect, a prima facie case of race discrimination is closely analogous to an issue of standing. It has no pertinence to the plaintiff's ultimate burden of introducing evidence of unlawful discrimination.

> Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. *Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed.*

*Griggs v. Duke Power Co.,* 401 U.S. 424, 430–31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (emphasis added). Because there is a haunting absence of evidence of discriminatory preference, the Court can only conclude that this litigation is frivolous and baseless and in clear violation of Rule 11.

■ While a finding of a violation of Rule 11 requires the imposition of sanctions, the selection of the type of sanction lies within the discretion of the Court. *Westmoreland v. CBS, Inc.,* 770 F.2d 1168 (D.C.Cir.1985). The imposition of sanctions is intended to compensate the prevailing party and deter the misconduct. Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181

(1985). The Rule itself demands an "appropriate sanction."

■ The defense and trial of this case obviously involved considerable time at the expense of the taxpayers of the United States. Such needless drain on the public coffers should not be taken lightly. Aside and apart from the time spent by the United States Attorney defending this suit, a conservative estimate of the time spent by the Court on the trial and disposition of this case is 25 hours. Here, the Court concludes that a sanction of Twenty Dollars ($20.00) per hour of judicial resource time wasted is appropriate.[5] Plaintiff John Edwards is therefore ORDERED to pay the sum of Five Hundred Dollars ($500.00) to the Clerk of the Court within 20 days from the entry of this Order. Additionally, plaintiff's attorney Mr. Chui Karega is assessed a similar sum of Five Hundred Dollars ($500.00) payable to defendant.[6] Said sum is likewise ORDERED payable within 20 days from the entry of this Order.

On a final note regarding the assessment of Rule 11 sanctions, the Court finds the following words of Judge Lee appropriate and worthy of repetition:

> This Court stands ready and willing to hear all meritorious cases, whether they are filed by jail inmates or citizens. But the crowded dockets of the federal courts cannot tolerate the burden posed by factually baseless suits that drain judicial resources. This Court will sanction those cases, like this one, that are so meritless they can only waste the courts' resources.

*Dominguez v. Figel,* 626 F.Supp. 368 (N.D. Ind.1986).

A judgment consistent with the foregoing shall enter accordingly.

IT IS SO ORDERED.

---

5. This amount seems quite lenient considering that one commentator has calculated the cost of one hour of federal court time to the taxpayers at $600.00. Levin and Colliers, *Containing the Cost of Litigation,* 37 Rutgers L. Rev. 219 (1985). By that standard the actual cost herein is in the neighborhood of $15,000.00.

---

6. The Court is aware that Mr. Karega was not the original attorney on this case. Nevertheless, upon entry of his appearance, he obviously incurred the obligation to adhere to the requirements of Rule 11.