**Kimberly E. SPATH, Plaintiff,**

v.

**BERRY PLASTICS CORPORATION, Defendant.**

No. 1:93 CV 2188.

United States District Court,
N.D. Ohio,
Eastern Division.

Oct. 18, 1995.

Denise J. Knecht, and Timothy S. Williams, Law Offices of Denise J. Knecht & Associates, Cleveland, OH, for plaintiff.

Robert B. Worley, Jr., Elmer E. White, III, Thomas P. Hubert, Kullman, Inman, Bee & Downing, New Orleans, LA, for defendant.

## MEMORANDUM AND ORDER

OLIVER, District Judge.

### I. *Procedural History*

Plaintiff, Kimberly E. Spath, filed claims of sex and disability discrimination in the Court of Common Pleas of Cuyahoga County under Ohio Revised Code § 4112.99 on September 23, 1993. Defendant, Berry Plastics Corporation ("Berry"), removed the case to this court on the basis of diversity jurisdiction on October 14, 1993.

Berry filed a motion for summary judgment on February 8, 1994. Berry sought to have Spath's sex discrimination claim dis-

missed, alleging that it was not an employer as defined by O.R.C. § 4112.01(A)(2) because it did not employ at least four persons within the State of Ohio. After receiving a right to sue letter from the Equal Employment Opportunity Commission, Spath filed a motion to amend her complaint on March 30, 1994, adding claims under 42 U.S.C. § 2000e based on sex discrimination and 42 U.S.C. §§ 12101–12117 based on disability discrimination.

On April 13, 1994, Berry filed a second motion for summary judgment. Berry sought to have the state disability discrimination claim dismissed, once again alleging that it was not an employer as defined by O.R.C. § 4112.01(A)(2) because it employs fewer than four persons within the State of Ohio. On April 15, 1994, the court submitted Berry's first and second motions for summary judgment to a Magistrate Judge for a report and recommendation. On September 30, 1994, the Magistrate Judge granted Spath's motion to amend her complaint and issued a report recommending that the court grant Berry's motions for summary judgment on the state law claims for sex and disability discrimination for the reasons advanced by Berry.

On December 21, 1994, Berry filed a third motion for summary judgment. Berry sought to have the federal sex and disability discrimination claims brought under 42 U.S.C. § 2000e and 42 U.S.C. §§ 12101–12117, respectively, dismissed on the grounds that Spath failed to establish prima facie cases of sex and disability discrimination.

The court considers herein the recommendation of the Magistrate Judge regarding the first and second motions for summary judgment. It also considers Defendant's third motion for summary judgment on the federal claims for which the court has not sought a recommendation from the Magistrate Judge.

This court originally obtained jurisdiction through Berry's removal of the case, pursuant to 28 U.S.C. § 1441, on the basis of diversity of citizenship, 28 U.S.C. § 1332. The court has jurisdiction over Spath's Title VII claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e–5(f)(3), and also over Spath's state law claims pursuant to the supplemental jurisdiction provided by 28 U.S.C. § 1367.

For the reasons stated hereafter, the court denies each of Defendant's motions for summary judgment.

## II. Standard for Summary Judgment

Summary judgment is appropriate where the entire record "shows that there are no genuine issues as to any material facts and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has held that "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If a motion for summary judgment is properly supported by the movant, Rule 56(e) requires the nonmoving party "to go beyond the pleadings and by [her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553 (quotation omitted).

In determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970) (citation omitted); *White v. Turfway Park Racing Assn., Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990). A fact is material only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## III. Facts as Construed in the Light Most Favorable to Plaintiff

Spath was hired as a sales representative by Mammoth Container Corporation ("Mammoth") in February 1983. (Pl.'s Resp. to Summ.J.Mot. at Ex. 1 (Spath Aff. at ¶ 3).) Mammoth manufactured and sold plastic containers. (Pl.'s Resp. to Summ.J.Mot. at 3.)

Spath's achievements and performance reviews at Mammoth demonstrated a high level of competence; she regularly received wage increases and promotions and, in both 1990 and 1991, her Midwest and West Coast regions had the highest sales in the company. (*Id.* at Ex. 1 (Spath Aff. at ¶¶ 4, 5).) Mammoth also granted Spath recognition for her performance. She was named Salesperson of the Year in 1986. She received the Sales Achievement Award in 1987 and she was appointed to the President's Club in 1988. (*Id.* at Ex. 1 (Spath Aff. at ¶ 5).)

As a regional sales manager for Mammoth, Spath's duties included supervising sales representatives nationwide and maintaining close contact with customers in the Midwest and West Coast regions. (Pl.'s Resp. to Summ.J.Mot. at 3.) Spath frequently visited with customers and developed new customer relationships. (*Id.* at 3.) Spath was responsible for 75% of the dairy container sales at Mammoth—more than any of her male counterparts. (*Id.* at 10.)

Defendant Berry officially took over Mammoth in February 1992. (*Id.* at Ex. 1 (Spath Aff. at ¶ 6).) Prior to the takeover, Mammoth's sales staff included two female managers, two female sales representatives, four male managers, and three male sales representatives. (Pl.'s Resp. to Summ.J.Mot. at 9.) Before merging with Mammoth, Berry had no females working in sales or marketing. (*Id.* at 8.)

Immediately before and after the takeover, Berry management developed a plan for restructuring Mammoth's sales and marketing operations into divisions. (*Id.* at 3.) In evaluating the sales and marketing staff of Mammoth, Berry management spoke only with male managers and sales representatives. (*Id.* at Ex. 2 (Bell Dep. at 81).) Douglas Bell, Berry's vice president of sales and marketing for dairy containers and aerosol caps, was in charge of reorganizing the merged dairy group. (Pl.'s Resp. to Summ.J.Mot at 3.) Bell failed to follow Equal Employment Opportunity regulations when interviewing Mammoth's employees. (*Id.* at 9, Ex. 2 (Bell Dep. at 127).)

On January 27, 1992, Berry invited Mammoth managers Jim Stratford and Dan Hughes, and sales representative Clark Wooley to visit Berry's headquarters to discuss the reorganization plan. (Pl.'s Resp. to Summ.J.Mot. at 3.) At Mammoth, Wooley and Hughes had produced lower dollar sales volume than did Spath, and she had supervised the less senior Wooley. *Id.* Spath was not invited to the January meeting, although she was considered to be one of the most knowledgeable managers in the dairy container business at Mammoth. (*Id.* at 3.) Bell acknowledges that personnel matters were discussed at this January 27th meeting. (*Id.* at Ex. 2 (Bell Dep. at 114, 179, 181, 184).)

There were no other organizational meetings of the Mammoth sales and marketing employees until after the takeover. (Pl.'s Resp. to Summ.J.Mot. at 4.) The next organizational meeting, held after the takeover, was attended by Hughes, Stratford, Wooley, independent contractor Ed Davy, and non-employee, Linda Wolf. (*Id.*) Spath, again, was not invited to the meeting. (*Id.*) Bell claims that Spath was not invited because she had an ankle injury that prevented her from traveling. (*Id.*) He did not explain why she was not involved through a phone conference, or why she could not be kept involved and informed through fax, correspondence or phone. (*Id.*)

Mammoth employees were invited to Berry's corporate offices for transition meetings. During these visits Berry treated the female employees of Mammoth significantly different than he treated the male employees of Mammoth. Spath provided affidavits from other female employees to demonstrate the disparate treatment women received. They are summarized below:

1. Marie Foy worked at Mammoth for three and a half years and had been promoted to a territory manager. When Berry began interviewing Mammoth representatives, the men were interviewed first. Foy was interviewed after most of the men had been interviewed. She was flown to Evansville, Indiana, Berry's corporate headquarters. She met with Brent Beeler, a vice president in charge of the general container group.

While in Evansville, Foy received the impression that none of the men took her seriously. Beeler interviewed her very quickly, without any level of thoroughness. None of her skills were discussed in detail.

Later she was informed that a man would be taking over her New England territory. She knew that the male representative who was assigned to her territory had less experience than her because a) he had no experience in injection molding as Foy did; and b) his experience was in aerosol, not dairy containers.

Foy was offered what she believed was a "firm" offer to handle a territory in California. When she expressed interest to Beeler, she was told that someone else was found to handle the Los Angeles territory. She discovered an inexperienced male had been hired to cover Los Angeles.

Foy was disturbed that she was not permitted to manage the California territory. When she asked Beeler why, he stated that one of her biggest customers in Boston was unhappy with her service. Foy called the customer to inquire. The customer denied ever criticizing her and expressed eagerness to recommend her for future employment.

(*Id.* at Ex. 3 (Foy Aff.).)

2. Lori Korniak was a marketing service manager at Mammoth and reported directly to the vice president. When Berry began interviewing Mammoth employees, Korniak observed that most of the male employees were interviewed first. In discussing her experiences with other employees, she learned that Wooley and Hughes were met at the airport and taken to dinner by Berry President Marty Imbler and Vice Presidents Beeler and Bell. The next day the men were taken on a tour of the company, had lunch with two vice presidents, and discussed different positions within Berry.

Korniak was not met at the airport and had to take a shuttle to the hotel where she sat alone all evening. The next day, Bell picked her up on his way to work. She was given a tour and spoke with Imbler and two vice presidents.

When the male executives at Berry left for lunch, she was not invited. Instead, a female art director, who was not involved in sales and marketing, invited her to lunch.

Korniak observed that the women employees at Berry seemed to be segregated into the lower end jobs and had no authority.

Korniak was eventually offered a job reporting to a sales manager, an obvious demotion. She declined the offer because she did not feel comfortable with the company.

(Pl.'s Resp. to Summ.J.Mot. at Ex. 4 (Korniak Aff.).)

3. Tawn Whittemore worked at Mammoth for 14 years as an operations manager. During the takeover, she observed that all high level managers at Berry were male, as were most of the employees. She commented about this discrepancy. Top level Berry managers admitted that they did not have enough female employees and considered it a shortcoming. President Imbler has a "vague recollection" of that conversation. (Pl.'s Resp. to Summ.J.Mot. at Ex. 8 (Imbler Dep. at 43).) During the transition meetings, she perceived that women were not welcome. She was "pumped" for information, but her opinions and recommendations were ignored.

Despite Whittemore's management role at Mammoth, Berry never offered her a position.

(Pl.'s Resp. to Summ.J.Mot. at Ex. 5 (Whittemore Aff.).)

Spath suffered similar experiences. Vice President Bell's secretary, rather than Bell himself, picked up Spath at the airport. She had an interview at lunch with Bell and Beeler. Four hours later she was returned to the airport by the secretary. (Pl.'s Resp. to Summ.J.Mot. at 5–7.)

Ultimately, only two female employees from the Mammoth sales staff remained as employees with Berry. (*Id.* at 7.) Spath was the only female in the dairy group. (*Id.*) Prior to the takeover, Mammoth sales personnel—all of whom were male except for Spath and Dischler—did not receive wage

increases from Mammoth. (*Id.* at 8.) Berry gave all employees from Mammoth a wage increase except for Spath. (*Id.*) When deciding whether Spath should be retained by Berry, Bell allowed the male sales personnel from Mammoth to decide whether Spath should be retained. (*Id.* at 10.) Both Stratford and Hughes advised Bell that Spath was a good and valued employee and should be part of the dairy team. (*Id.* at 3.) Spath was retained by Berry but she was demoted to a lower position with fewer responsibilities. (*Id.* at Ex. 2 (Bell Dep. at 106–08).)

On February 8, 1992, Spath was admitted to a hospital with a broken ankle. (Pl.'s Resp. to Summ.J.Mot. at 11.) On February 9, surgery was performed and a plate and screws were implanted. (*Id.*) In order to show her loyalty to Berry, and against the advice of her doctor, Spath agreed to work at Berry's plant in Iowa Falls, Iowa, for 12 weeks following her surgery. (*Id.* at 11–12.) During this time she worked 10 and 12–hour days, including weekends, reorganizing customer service. (*Id.* at 12.) Spath assisted in turning around a loss of business that resulted after the acquisition. (*Id.* at 11.)

On August 20, 1992, Spath was readmitted to the hospital to have the plate and screws removed. (*Id.*) During recuperation from the surgery Spath could not walk, drive or travel, but she was able to conduct business by phone. (*Id.*) At every opportunity, Bell raised her disability as a problem. (*Id.* at 12.) Two days after her second surgery, Bell called Spath and was verbally abusive. (*Id.*) Bell prodded her to "get on the road" even though she was able to make planning and sales calls by phone from her home, a common practice of other sales representatives. (*Id.* at Ex. 1 (Spath Aff. at ¶ 21(h).)) The sales people in the dairy group lived in different parts of the country, and each used their homes as their business location. (Pl.'s Resp. to Summ.J.Mot. at 11.)

Immediately after the takeover, Bell did not give any assignments to Spath because she "just broke her leg." (*Id.* at 12.) He did not explain why he could not give her an assignment, or why he could not accommodate her inability to travel. (*Id.*) He never assessed her relationships with customers as

he did with other sales employees because "she couldn't travel." (*Id.*) Bell made no personal effort to identify Spath's skills and abilities because "she had a broken leg." (*Id.*) Bell also stated that he did not give Spath a pay increase because of her injury. (*Id.* at 13.)

Even after the acquisition became official, Bell did not ask Spath about her sales experience on the West Coast. (*Id.* at Ex. 2 (Bell Dep. at 110–111, 194).) He made no effort to learn of her knowledge of the dairy container industry. (*Id.* at Ex. 2 (Bell Dep. at 198).) He made assignments throughout the country without regard to Spath's preexisting customer contacts in the Midwest and West Coast regions. (*Id.* at Ex. 2 (Bell Dep. at 194).)

By the time Spath was terminated on September 28, 1992, all of the females who had filled management or supervisory roles at Mammoth were gone. (Pl.'s Resp. to Summ. J.Mot. at 8.) Karen Dischler, the only other female Mammoth employee retained by Berry, remained in a non-management sales position. (*Id.*) Spath claims that Dischler told her that at Berry she experienced humiliating and unequal treatment as compared to the male sales representatives. (*Id.*)

Vice President Bell testified that Spath was terminated for economic reasons. (*Id.* at Ex. 2 (Bell Dep. 77–78).) Bell alleges that a drop in business and loss of customers after the acquisition led to "economic" conditions that required him to "lay off" Spath. (Pl.'s Resp. to Summ.J.Mot. at 14.) Bell, however, also testified that he specifically instructed Spath and other sales representatives not to seek new customers, nor make new sales. (*Id.* at Ex. 2 (Bell Dep. at 195).) Furthermore, when Spath was terminated, no other individuals were laid off by Berry for economic reasons. (Pl.'s Resp. to Summ.J.Mot. at 14.) Marcia Jochem, Berry's Manager of Human Resources, testified in 1994 that she knew of no employees in sales and marketing who had been laid off in the last five years. (*Id.*) Additionally, Bell has stated that sales dropped dramatically at the Iowa Falls plant, but there were no layoffs at the plant even though it was losing money. (*Id.*)

To cast further doubt on the actual cause of Spath's termination, Berry's President, Marty Imbler, testified in his deposition that Spath was terminated because she could not relocate. (*Id.* at Ex. 8 (Imbler Dep. at 54, 56).) Spath, however, claims that she was willing to relocate, but she was never requested to do so. (Pl.'s Resp. to Summ.J.Mot. at 13.) Although other sales employees were asked to relocate, Bell has stated that Spath was not asked to relocate because "she was incapacitated" by her broken ankle. (*Id.* at Ex. 2 (Bell Dep. at 97, 102).) Spath informed Bell several times that she was ready, willing and able to transfer. (Pl.'s Resp. to Summ.J.Mot. at 13.)

Defendant argues in its motion that Spath was terminated because it did not need a sales representative in Ohio. (Def.'s Mot. for Summ.J. at 2 (Dec. 21, 1994).) Several male sales representatives have made sales calls in Ohio since Spath's termination. (Pl.'s Resp. to Summ.J.Mot. at Ex. 2 (Bell Dep. at 135–138).) Bell stated in his deposition that in 1992, "[w]e were looking for good people, not necessarily ... in any geographical location...." (*Id.* at Ex. 2 (Bell Dep. at 157–58).)

The sales and marketing management team at Berry is all male, including Bell, Beeler, Randy Hobson, Randy Becker, and Brent Kaufman. (*Id.* at Ex. 2 (Bell Dep. at 57).) After Spath's termination, Wooley was removed from the dairy group, and a position was found for him in the general container group. (Pl.'s Resp. to Summ.J.Mot. at Ex. 1 (Spath Aff. ¶ 20(e).) Hughes was relocated twice, first to Nevada, then to Indiana. (Pl.'s Resp. to Summ.J.Mot. at Ex. 2 (Bell Dep. at 197).) Hughes covered the West Coast when relocated to Nevada, which was a territory formerly managed by Spath. (*Id.* at Ex. 2 (Bell Dep. at 164, 196–197).) After Spath was terminated, Hughes was relocated back to Indiana and was given Spath's former account territory in the Midwest. (*Id.*) He handled Midwest assignments until a new sales representative, Peter Gidera, took over. (*Id.*) When Gidera left Berry, Hughes again covered the Midwest. (*Id.*)

Male sales representatives were hired before and after Spath was fired. (Pl.'s Resp. to Summ.J.Mot. at 10.) Matt Marshall was hired in February 1993, to handle Tennessee, Kentucky, Southern Illinois, Kansas, and Missouri, areas formerly covered by Spath. (*Id.* at Ex. 2 (Bell Dep. at 75).) Adam Unfried was hired in July 1993, to cover parts of Ohio, Kentucky, and Tennessee. (Pl.'s Resp. to Summ.J.Mot. at Ex. 11 (Def.'s Answer to Interrog. No. 11).)

### IV. *Discussion*

Spath is asserting four claims against Berry. Spath is claiming disparate treatment sex discrimination under both 42 U.S.C. § 2000e and Ohio Revised Code § 4112.99. Spath also claims disability discrimination under both the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12117 and Ohio Revised Code § 4112.99.

### A. *Disparate Treatment Sex Discrimination Under Title VII*

Spath is alleging disparate treatment sex discrimination under 42 U.S.C. § 2000e, Title VII of the Civil Rights Act of 1964. To sustain her sex discrimination claim, Spath must satisfy the test under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In *McDonnell Douglas Corp.,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25, the Supreme Court established the following order and allocation of proof in an employment discrimination case: (1) the plaintiff must establish a prima facie case; (2) the defendant must articulate a legitimate, non-discriminatory reason for its action; and (3) the plaintiff must establish that the defendant's proffered explanation is a pretext to mask illegal motives. The Plaintiff bears the ultimate burden of persuading the court that she has been the victim of intentional discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94 (1981) (citations omitted).

The first question is whether Spath has established a prima facie case of disparate treatment sex discrimination. In *Mills v. Ford Motor Co.,* 800 F.2d 635, 639 (1986), the Sixth Circuit explained,

*McDonnell Douglas* does not require that the identical *prima facie* analysis be used in every discriminatory discharge case. As the Supreme Court has explained, the *prima facie* case may differ with each factual situation. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 575 [98 S.Ct. 2943, 2948–49, 57 L.Ed.2d 957] (1978). [citation omitted] All the plaintiff must establish at the *prima facie* stage is that her discharge raised an inference of discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.... We are ever mindful that the *prima facie* burden is not a heavy one, *Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94, and the proof need not be conclusive.

The prima facie elements used by the court in *Mills*, 800 F.2d at 638, are applicable to this case: 1) that plaintiff belongs to a protected class, 2) that plaintiff was satisfactorily performing her job, and 3) that despite this performance, plaintiff was terminated.

The record, viewed in a light most favorable to Spath, makes out a prima facie case of disparate treatment sex discrimination under Title VII. First, as a woman, Spath is a member of a protected class. Second, Spath has shown that she was a highly competent employee of Mammoth and that she regularly received wage increases and promotions. Third, the record supports the conclusion that Spath's termination on September 28, 1992, was based on her gender, not her performance. When Spath was terminated, all of the females who had filled management or supervisory roles at Mammoth were gone, and the sales and marketing management team at Berry was all male.

Spath also has shown that Berry treated the female employees of Mammoth less favorably than their male counterparts during the merger process. Before merging with Mammoth, Berry had no females in sales and marketing. While planning the merger of the two companies' employees, Berry spoke only with male managers and sales representatives in evaluating the sales and marketing staff of Mammoth. Only two of the four female employees from the Mammoth sales staff were hired by Berry, and Spath was demoted to a position with fewer responsibilities.

As explained above, the burden now shifts to the Defendant to articulate a proper, non-discriminatory reason for its decision. *McDonnell Douglas Corp.*, 411 U.S. at 802–803, 93 S.Ct. at 1824–1825. Berry has carried that burden. Vice President Bell testified that Spath was terminated for economic reasons. Bell alleges that a drop in business and loss of customers after the acquisition led to "economic" conditions that required him to terminate Spath.

Spath, however, has successfully rebutted Berry's assertion by showing the non-discriminatory reason given was merely a pretext for the discrimination. First, no other individuals were laid off by Berry at the time of Spath's termination. Marcia Jochem, Berry's Manager of Human Resources, testified in 1994 that she knew of no employees in sales and marketing who had been laid off in the last five years.

Second, Bell testified that he specifically instructed Spath and other sales representatives not to seek new customers nor make new sales. Additionally, Bell has stated that sales dropped dramatically at the Iowa Falls plant, but there were no layoffs at the plant even though it was losing money. Bell also stated that in 1992, "[w]e were looking for good people, not necessarily ... in any geographical location ..." (Pl.'s Resp. to Summ.J.Mot. at Ex. 2 (Bell Depo. at 157–58).) Male sales representatives were hired before and after Spath was fired.

To cast further doubt on the actual cause of Spath's termination, Berry's President, Marty Imbler, testified in his deposition that Spath was terminated because she could not relocate. (*Id.* at Ex. 8 (Imbler Dep. at 54).) Spath, however, claims that she was ready, willing and able to relocate, but was never requested to do so. (Pl.'s Resp. to Summ. J.Mot. at 13.)

While Berry has provided a proper, non-discriminatory reason for its decision to terminate Spath, she has successfully rebutted Berry's assertion. Summary judgment is inappropriate since there are material facts in dispute as to why Berry terminated Spath.

Thus, Berry is denied summary judgment in regard to the Title VII sex discrimination claim.

### B. *Sex Discrimination Claim Under Ohio Revised Code*

Spath also claims that she was discharged because of her sex in violation of O.R.C. §§ 4112.02 and 4112.99.

■ Berry acknowledges that Ohio's Fair Employment Practices Law, O.R.C. § 4112.02, prohibits an employer from discriminating against an individual on the basis of his or her race, color, religion, sex, national origin, handicap, or ancestry. (Mem. in Supp. of Def.'s Summ.J.Mot. at 3 (Feb. 8, 1994).) Berry argues, however, that Ohio law does not apply to it because it is not within the statutory definition of an "employer." (*Id.*) Section 4112.01(A)(2) defines an "employer" as, "[a]ny person employing four or more persons within the state, and any person acting directly or indirectly in the interest of an employer." Berry alleges that Spath was its only employee in Ohio.[1] (*Id.* at 3 (citing Jochem Affidavit).)

Spath has countered by alleging that Berry has refused to provide discovery information on this issue.[2] (Pl.'s Mot. to Supp.Resp. to Summ.J.Mot. at 1 (Apr. 6, 1994).) Nonetheless, Spath filed an affidavit with her supplemental response wherein she states:

> 2. Since my termination with Berry Plastics, I became aware of at least four employees of Berry Plastics Corporation who conducted the company's business within Ohio.

> 3. These individuals are Dan Hughes, Dairy National Sales Manager; Rich Gahagan, National Accounts Manager; Doug Bell, Executive V.P.; Adam Unfried, salesperson.

> 4. I am also aware of other individuals who are manufacturing representatives, or sales people for Berry who conduct business for the company in Ohio.

(*Id.* at Ex. 1 (Spath Aff.).) Defendant has responded by claiming that it did not employ Don Hughes, Rick Gahagan, Doug Bell, or Adam Unfried in Ohio. (Def.'s Reply Mem. at 3 (Apr. 13, 1994).)

The Sixth Circuit has noted that "the Ohio Legislature intended for section 4112.02 to be liberally construed." *Eyerman v. Mary Kay Cosmetics, Inc.,* 967 F.2d 213, 219 (6th Cir. 1992) (citing O.R.C. § 4112.08 ("[t]his chapter shall be construed liberally for the accomplishment of its purposes....")) The individuals Spath specifically lists in her affidavit may be deemed employees of Defendant depending upon the nature and extent of the work they did in Ohio, if any. Therefore, a factual dispute exists between the parties in regard to the number of persons Berry employed in Ohio under the statute.[3] Thus, summary judgment on the ground that Defendant is not an employer in Ohio must be denied.

Next the court will address the motion in regard to the charge of sex discrimination itself. In interpreting O.R.C. § 4112.99,[4] the Ohio Supreme Court has followed the federal case law construing Title VII. *See, e.g., Barker v. Scovill,* 6 Ohio St.3d 146, 147, 451 N.E.2d 807, 809 (1983); *Plumbers & Steam-*

---

1. Section 4112.01(A)(3)'s definition of "employee" includes "an individual employed by any employer but does not include any individual employed in the domestic services of any person."

2. Defendant has used a narrow definition of employee when responding to discovery requests concerning its employees in Ohio. *See,* Pl.'s Reply Mem. at Ex. A (Def.'s Resp. to Pl.'s First Set of Interrogs. and Doc.Reqs.).

3. This factual dispute can only be resolved at trial through the testimony of the pertinent witnesses, who may include the Plaintiff and the four Berry employees who Plaintiff alleges worked in Ohio.

4. Ohio Revised Code Section 4112.99 provides:

> Whoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief.

Section 4112.02 provides:

> It shall be an unlawful discriminatory practice:

> (A) For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

*fitters Joint Apprenticeship Committee v. Ohio Civil Rights Commission,* 66 Ohio St.2d 192, 197–98, 421 N.E.2d 128, 131–32 (1981); *State ex rel. Republic Steel Corp. v. Ohio Civil Rights Commission,* 44 Ohio St.2d 178, 182–83, 339 N.E.2d 658, 661–62 (1975). The motion for summary judgment regarding the Ohio sex discrimination claim must be denied for the same reasons discussed in regard to the federal claim.

### C. *Americans with Disabilities Act Claim*

Spath is claiming disability discrimination under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12117.

■■■ In 1990, Congress passed the Americans with Disabilities Act (hereinafter ADA), 42 U.S.C. §§ 12101–12117 with an effective date of July 26, 1992.[5] Pub.L. No. 102–166, Title I, § 108. Recognizing the historical discrimination suffered by individuals with disabilities, Congress sought "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

The Americans with Disabilities Act provides as a general rule:

No covered entity[6] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In order to qualify for relief under the Act, a plaintiff must establish: (1) that she was disabled within the definition of the ADA; (2) that she was qualified, with or without reasonable accommodation, and able to perform the essential functions of the job; and (3) that the employer discriminated against the plaintiff in regard to job application procedures, hiring, advancement, discharge, employee compensation, job training, or other terms, conditions, and privileges of employment. *See, White v. York International Corp.,* 45 F.3d 357, 360 (10th Cir.1995).[7]

■■■ Berry argues that Spath is not a member of the protected class, that is, that Spath's broken ankle does not qualify her as an "individual with a disability." (Def.'s Summ.J.Mot. at 8–9.) The ADA defines a "disability" as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; *or* (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2) (emphasis added).[8] Federal regulations promulgated

---

**5.** Spath was admitted to a hospital with a broken ankle on February 8, 1992. Although she suffered her original injury prior to the effective date of the ADA, the record suggests that Berry did not perceive her as being disabled until August 1992. *See, Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 557 (D.Kan.1995) (finding that the ADA does not apply retroactively). It was after Spath's second surgery on August 20, 1992, that Vice President Bell began commenting that her ankle problems were interfering with her work.

**6.** The ADA defines a "covered entity" as "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2).

**7.** Berry asserts the prima facie case should include an additional element: (4) that the employer replaced plaintiff with a non-disabled worker.

(Def.'s Summ.J.Mot. at 8) (citing *Sherman v. Optical Imaging Systems, Inc.,* 843 F.Supp. 1168, 1181 (E.D.Mich.1994)). While a showing that the employer replaced the plaintiff with a non-disabled worker is evidence of discrimination, the ADA does not require such a showing as an element. *See,* 42 U.S.C. § 12112(a). Rather, the ADA prohibits discrimination "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.*

**8.** As Chief Judge Posner has noted:

'Disability' is broadly defined. It includes not only 'a physical or mental impairment that substantially limits one or more of the major life activities of [the disabled] individual,' but also the state of 'being regarded as having such an impairment.' §§ 12102(2)(A), (C). The latter definition, although at first glance peculiar,

by the Equal Employment Opportunity Commission define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 CFR § 1630.2(i) (1994).

Spath claims that Berry discriminated against her "on the basis of her handicapping condition or perceived handicapping condition." (Pl.'s Resp. to Summ.J.Mot. at 12.) Berry correctly points out that, in reality, Spath did not have a physical impairment that substantially limited her ability to perform one or more life activity. (Def.'s Summ.J.Mot. at 9 (citing Spath Dep. at 109) (December 21, 1994).) As explained in the federal regulations, "[t]emporary, non-chronic impairment of short duration, with little or no long-term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken bones, sprained joints, concussions, appendicitis, and influenza." 29 CFR Pt. 1630, app. (Appendix to Part 1630—Interpretive Guidance on Title I of the Americans with Disabilities Act).

Spath has shown, however, that Berry regarded her has having a physical impairment that substantially limited one or more of her major life activities—the ability to walk and perform manual tasks.[9] Spath states in her deposition that her supervisor, Vice President Bell, "perceived [that the problem with her ankle] was an ongoing situation." (Spath Dep. at 70.) On several occasions through-out Spath's recuperation from her ankle surgery, Bell commented that her ankle was interfering with her work. Bell repeatedly told Spath her ankle injury was a problem. Immediately after the takeover, Bell did not give any assignments to Spath because she "just broke her leg." He never assessed her relationships with customers, as he did with other sales employees, because "she couldn't travel." (Pl.'s Resp. to Summ.J.Mot. at Ex. 2 (Bell Dep. at 113).) Although other sales employees were asked to relocate, Bell has stated that Spath was not asked to relocate because "she was incapacitated" by her broken ankle. (*Id.* at Ex. 2 (Bell Dep. at 97, 102).) Spath informed Bell several times that she was ready, willing and able to transfer. A reasonable jury could find that Berry regarded Spath as having a disability. Spath has raised a genuine issue of material fact as to whether she is within the ADA's protected class of citizens.

 Spath has also satisfied the second element of the ADA's prima facie case—that she was qualified, with or without reasonable accommodation, and able to perform the essential functions of the job. Spath's employment history with Mammoth prior to its takeover by Berry shows that she was qualified for her position with Berry. Spath has shown that she could perform the essential functions of her job. Bell prodded Spath to "get on the road" even though she was able to make planning and sales calls by phone

---

actually makes a better fit with the elaborate preamble to the Act, in which people who have physical or mental impairments are compared to victims of racial and other invidious discrimination. Many such impairments are not in fact disabling but are believed to be so, and the people having them may be denied employment or otherwise shunned as a consequence. Such people, objectively capable of performing as well as the unimpaired, are analogous to capable workers discriminated against because of their skin color or some other vocationally irrelevant characteristic.

*Vande Zande v. State of Wisconsin,* 44 F.3d 538, 541 (7th Cir.1995).

9. The federal regulations state:

If an individual cannot satisfy either the first part of the definition of "disability" or the second "record of" part of the definition, he or she may be able to satisfy the third part of the definition. The third part of the definition provides that an individual who is regarded by an employer or other covered entity as having an impairment that substantially limits a major life activity is an individual with a disability.

There are three different ways in which an individual may satisfy the definition of "being regarded as having a disability":

(1) The individual may have an impairment which is not substantially limiting but is perceived by the employer or other covered entity as constituting a substantially limiting impairment;

(2) The individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or

(3) The individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantially limiting impairment.

29 CFR Pt. 1630, App. (citing Senate Report at 23, House Labor Report at 53; House Judiciary Report at 29).

from her home. Bell seemingly could have accommodated Spath's injury since other sales people in the dairy group used their homes as their business location.

■ Finally, Spath has shown that Berry discriminated against her in regard to advancement, employee compensation and discharge. Bell made no personal effort to identify Spath's skills and abilities because she had a broken leg. Bell also stated that he did not give Spath a pay increase because of her injury.

Courts have recognized burden shifting under the ADA similar to the test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which applies in Title VII discrimination cases:

> Once the plaintiff produces evidence sufficient to make a facial showing that accommodation is possible, the burden of production shifts to the employer to present evidence of its inability to accommodate. *See, Mason [v. Frank]*, 32 F.3d [315] at 318 [ (8th Cir.1994) ]; *Barth [v. Gelb]*, 2 F.3d [1180] at 1187 [ (D.C.Cir.1993) ]; *Gilbert [v. Frank]*, 949 F.2d [637] at 642 [ (2d Cir.1991) ]. If the employer presents such evidence, the plaintiff may not simply rest on his pleadings. He 'has the burden of coming forward with evidence concerning his individual capabilities and suggestions for possible accommodations to rebut the employer's evidence.'

*White*, 45 F.3d at 361; *see e.g., Sherman v. Optical Imaging Systems, Inc.*, 843 F.Supp. 1168, 1181 (E.D.Mich.1994). Berry, however, has produced no evidence of its inability to accommodate Spath's perceived disability.

Spath has raised genuine issues of material fact as to whether Berry violated the ADA by discriminating against her on the basis of a perceived handicap.

### D. *Disability Claim Under the Ohio Revised Code*

Berry argues, as it did regarding Spath's sex discrimination claim under Ohio's Fair Employment Practices Act, O.R.C.

§§ 4112.02 and 4112.99, *supra,* that § 4112.02 does not apply to it because Spath was Berry's only employee within the State of Ohio. Therefore, Berry employs fewer than four people within the State of Ohio and is not within the statutory definition of "employer."

This court finds, for the same reasons it did in regard to Spath's sex discrimination claim discussed *supra,* that Spath has presented genuine issues of material fact regarding whether the Defendant employed the requisite number of persons under the statute. Thus, summary judgment cannot be granted as a matter of law on the ground that Berry employed less than four people in Ohio.

■ The court will, therefore, address the disability claim. Disability discrimination under Ohio law is very similar to the ADA. Effective June 30, 1992, the Ohio Legislature amended O.R.C. § 4112.01(A)(13), which redefines a "handicap" as:

> [A] physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; *or being regarded as having a physical or mental impairment.*

(emphasis added). The recently amended disability discrimination law, O.R.C. § 4112, has been explained by one Ohio court in the context of summary judgment:

> To support a claim for violation of O.R.C. § 4112.02, plaintiff must, at trial, initially present a *prima facie* case of handicap discrimination. To defend against a motion for summary judgment,[10] plaintiff should demonstrate that there is a genuine issue of material fact as to whether (1) he is handicapped, (2) action was taken by his employer (at least in part) because he was handicapped, and (3) even though plaintiff is handicapped, he can safely and substan-

---

**10.** Ohio's standard for summary judgment is the same as under Fed.R.Civ.P. 56. *See, Wing v. Anchor Media, Ltd.*, 59 Ohio St.3d 108, 570

N.E.2d 1095, 1096 (1991) (expressly adopting the *Celotex* standard of review for summary judgment).

tially perform the essential functions of the job in question with reasonable accommodations.

*Wooten v. City of Columbus,* 91 Ohio App.3d 326, 632 N.E.2d 605, 608–09 (1993) (citing *Hazlett v. Martin Chevrolet, Inc.,* 25 Ohio St.3d 279, 281, 496 N.E.2d 478, 480 (1986)). As recently amended, the new disability discrimination law in Ohio is very similar to the federal ADA.[11] Consequently, the court denies the motion for summary judgment regarding the Ohio disability claim for the same reasons it denied the motion for summary judgment in regard to the Americans With Disabilities Act claim.

### V. *Conclusion*

The court declines to adopt the Magistrate Judge's recommendation that Defendant's motions for summary judgment regarding the Ohio sex discrimination and disability claims be granted.

The court hereby denies both of those motions for summary judgment finding that there are genuine issues of material fact in regard to each of Plaintiff's claims and that judgment cannot be entered as a matter of law. Further, the court hereby denies Defendant's third motion for summary judgment regarding the federal sex and disability discrimination claims. There are genuine issues of material facts in regard to those claims as well and judgment cannot be entered as a matter of law.

IT IS SO ORDERED.

---

11. The *Wooten* court noted: R.C. Chapter 4112 was in 1990, and still is, as broad as, if not broader than, the present federal laws prohibiting handicap discrimination. Additionally, R.C. 4112.02 was recently amended to state in new subsection (Q) that:

'(2) Divisions (A) to (E) of this section do not prohibit an employer ... from doing any of the following:

.     .     .     .     .

'(f) Exercising other authority recognized in 'The Americans with Disabilities Act of 1990.'

104 Stat. 327, 42 USCA 12101, as amended, including but not limited to, requiring employees to comply with any applicable federal standards.'

\*     \*     \*     \*     \*     \*

In liberally construing R.C. Chapter 4112, the minimum standards were in 1990 and are now at least those outlined in the Americans with Disabilities Act, Section 12101, Title 42, U.S.Code. 632 N.E.2d at 611.